HAMILTON *v.* STATE.

Opinion delivered July 8, 1896.

INDICTMENT—FINDING AT SPECIAL TERM.—The validity of an indictment found at a special term of the circuit court will not be affected by the fact that, had the case been tried at such special term, it could not have been concluded before the regular term of another circuit court in the same district.

SAME—WAIVER OF IRREGULARITIES.—An indictment will not be quashed because the accused was not allowed to be present while the grand jury was being impaneled, and was given no opportunity to challenge grand jurors for cause, where no prejudice is shown, and no objection was raised until after a plea of not guilty had been entered.

MURDER—SUFFICIENCY OF INDICTMENT.—An indictment alleging that defendant " did unlawfully, wilfully, feloniously, and of his malice aforethought, and after deliberation and premeditation, kill and murder," etc., is sufficient, without alleging that the killing was " malicious."

CONTINUANCE—WHEN REFUSAL NOT ERRONEOUS—It is not error to deny a continuance in a prosecution for murder for the absence of a witness who would testify that on one occasion deceased made an unprovoked assault on witness, such assault having no connection with the killing, and not being competent evidence of deceased's character; nor is it error to refuse a continuance where it is not shown that the testimony of the absent witness could be procured by a continuance.

SAME—DISCRETION OF COURT.—It is no abuse of discretion to deny a continuance in order that defendant's counsel may have further time to prepare for trial, where defendant was in jail on the charge for several weeks before trial and neglected to employ counsel, and where defendant was the sole eye witness to the killing.

JURY—DISCRETION OF COURT is not abused in excusing a juror for ill-health or in rejecting a juror because he has formed an opinion as to the merits of the case.

JURY—SEPARATION.—Permitting the jury in a murder case to separate before the cause was finally submitted to them is not reversible error where no prejudice is shown.

APPEAL—OBJECTION NOT RAISED BELOW.—An objection will not be considered on appeal where no exception was saved below, and the matter was not referred to in the motion for a new trial.

HOMICIDE—INSTRUCTION.—One desiring an instruction in a murder case as to the second degree of murder should present a correct instruction.

INSTRUCTION—CREDIBILITY OF DEFENDANT.—It is not error to charge the jury that they have the right, in considering the testimony of the defendant, to take into consideration his interest in the result of the verdict, in order to determine the proper weight to be given to his testimony.

SAME—WHEN ABSTRACT.—The court may properly refuse to instruct as to self-defense where there is no evidence upon which to base such an instruction.

DEFENDANT AS WITNESS—CONTRADICTION.—Where the state proves that defendant, at the time he borrowed the gun with which he killed deceased, stated that he wanted it to shoot ducks, it may show that such statement was false.

Appeal from Logan Circuit Court.

JEPHTHA H. EVANS, Judge.

STATEMENT BY THE COURT.

The appellant, Charles Hamilton, on the 2d day of December, 1895, in the Charleston district of Franklin county, killed A. C. McAbee by shooting him with a gun. He surrendered himself, and was placed in jail at Ozark, in said county, to await the action of the grand jury. The day for the holding of the next regular term of the circuit court for the Charleston district of said county, after said killing, was the first Monday in February, 1896; but the judge of the circuit court, on the 12th of December, 1895, issued an order for a special term of said court, to be held on the 30th day of December, 1895, for the trial of Hamilton. The special term

convened on that day. A grand jury was impaneled, and soon afterwards returned an indictment against Hamilton, charging him with murder in the first degree. The body of the indictment alleged that "the said Chas. Hamilton, on the 2d day of December, 1895, in the county and district aforesaid, did unlawfully, wilfully, feloniously, and of his malice aforethought, and after deliberation and premeditation, kill and murder one A. C. Mc-Abee, by shooting him, the said A. C. McAbee, with a certain gun which the said Chas. Hamilton then and there had and held in his hands, the said gun then and there being loaded with gunpowder and leaden bullets, against the peace and dignity of the state of Arkansas. Sam. R. Chew, Pros. Attorney."

The defendant filed a motion to quash this indictment, for the reason that the special term of court at which it was found was ordered at a time and under circumstances not authorized by law. The motion was overruled. The defendant thereupon filed a demurrer to the indictment, which was also overruled. A motion for continuance filed by the defendant was overruled, and then, on motion of defendant, the venue was changed to the Logan circuit court. On the 8th day of January, 1896, the case was called in the Logan circuit court. The defendant again filed a motion for a continuance, which was overruled, and the defendant placed on trial. From the evidence adduced at the trial, the following facts appear: The deceased, McAbee, was a farmer, fifty-three years of age, who lived upon his farm two miles distant from the town of Charleston, in Franklin county. The appellant, Hamilton, a young man about 26 years old, and a cousin of the wife of McAbee, cultivated a crop on McAbee's place in 1895, but during the summer he left the place, and went to Texas. After remaining there two or three months, he returned to this state. On the morning of December 2, 1895, he called at

McAbee's house between 9 and 10 o'clock, and inquired for McAbee. Upon being told that McAbee was in the field, plowing, he walked over to the field. When Hamilton approached the field, McAbee was alone, plowing, and no one was present until after the killing, except McAbee and Hamilton. What then took place was told by Hamilton himself on the witness stand, as follows: "I told him [McAbee] that I was going to Mazzard Prairie to collect a debt, and that I had come by to get what he owed me for pitching up some hay. We stood there, and talked some time, and McAbee said it was too cold to stand there, and asked me to walk with him while we talked. So I walked several rounds with him, and finally McAbee said that he did not owe me anything, and would not pay me anything. I told him that he owed me $5.75, but that I would give him $2.00, and he could pay me $3.75. But he said that he did not consider that he owed me anything, and would not pay me anything; that I owed him for board while I stayed there and was not at work; that if anybody was to pay money I ought to pay him for my board. So I left, and went back to the house, where I had left my horse. This was about 9 o'clock in the morning. I told Cousin Mary [Mrs. McAbee] that the old man would not pay me, and that I was going to town, and see what I could do with the law. I got on my horse, and rode back up in the field, and told Mr. McAbee that, if he did not pay me, I was going to town, and attach a stack of hay, and he plowed on, and told me to go on and do what I was going to do, that he did not care what I did, but not to come bothering him; so I went on." Hamilton then stated that, on the way to town, he saw some ducks in a branch, and that he borrowed a shotgun from a man named Dawson to shoot the ducks. When he returned, the ducks had gone, and, after looking for them a while, he went again to the field where McAbee was plowing.

"McAbee asked me," said Hamilton, "what I was doing with that gun. I told him about being after the ducks, and said to him that we could settle our differences some other way than by going to law with it. McAbee told me to get out of his field, and pulled out his knife, and came at me with it, waving his hands, and saying he would tear me all to pieces. I told him not to come, to stand back. At that time my gun was resting on the ground, on the butt end of the gun. He kept coming at me, so I raised the gun, and fired, when McAbee staggered, and fell backwards. I then walked up in about two feet of him, and stood there a moment or so, and heard him groan a time or two. Then I walked back to where I left my horse, and went up to Mr. Dawson's, and put the gun up, and then rode over to my brother-in-law, Mr. House, about twelve miles, and told him about it, and we came back to Charleston that night about dark, and I gave myself up to Mr. Carter, the deputy sheriff."

There was testimony tending to contradict some of the statements of defendant.

After McAbee was killed, his body remained on the ground until late in the afternoon. It was then found by a boy sent to look for him. The horses were still standing hitched to the plow, which had fallen over, but apparently had not been moved. The body of McAbee lay face upwards, the feet within a few inches of the plow handles. In his left hand was his pocket knife, loosely grasped, the blade open. On his feet were a pair of coarse brogan shoes which he wore. Hamilton on that day wore a pair of sharp-toed shoes about No. 6 or 7 in size. The witnesses testified that the tracks made by these shoes of Hamilton on the plowed ground when he approached and left the body could be plainly seen. At one place about seventy-five yards from the body the tracks of deceased were seen where he had removed a

loose stump from the plowed ground. With this excep-
tion, although the witnesses looked carefully, no other
tracks of the deceased were found, except such as he
made in the furrow following his plow, and at the ends
of the furrows when he turned his team. Dawson, the
man from whom Hamilton borrowed the gun, testified
that Hamilton asked him for his gun to shoot some ducks
in the branch. "I told him," said Dawson, "that he
could have the gun.   *   *   I got him some shells that I
had loaded for bird shooting. The defendant said he .
wanted some larger shot, and asked me if I did not have
some larger shot. I told him I thought so, and looked
about in the closet, and found three shells that I had
loaded last spring to shoot some geese. The shot were
large duck shot.   *   *   I handed the defendant the
shells, and he asked me for a gimlet to draw the wads
with, to see the size of the shot. I could not find the
gimlet, and the defendant then took out his knife, and
drew the wad, and looked in the shell, and remarked to
me, 'These are the ones. These will do.' He took the
gun, and left," etc. These were the main facts in evi-
dence. Such other portions of the evidence necessary
to notice are referred to in the opinion.

*Rowe & Rowe, J. Frank Keith* and *Robert J. White*,
for appellant.

1. The indictment should have been quashed. (1)
There was no reason for a special term of the court.
(2) There was no person confined in the county jail
subject to trial. (3) The holding of a special term
must not interfere with the holding of the regular term.
Sand. & H. Dig., 1312, 1130. The power to hold a
special term being a special power, every circumstance
necessary to its exercise must exist, and *appear of record*.
9 Ark. 326; 2 *id*. 230.

2.  Defendant had no opportunity to object to the grand jury.  Sand. & H. Dig., sec. 2067; 50 Ark. 534; 44 *id*. 332.

3.  The indictment was bad.  The word "malicious" is omitted entirely.  60 Ark. 567; Sand. & H. Dig., sec. 1644; 21 Ark. 183; 43 *id*. 345.

4.  It was error to refuse the continuance.  2 Bish. Cr. Pro. (3 Ed.), sec. 610.

5.  It was error to excuse jurors Creekmore, Morris, and Henry.  They were competent jurors.  47 Ark. 185; 40 *id*. 460.

6.  The evidence is totally inadequate to sustain the verdict.

7.  The court erred in its instructions.  See 49 Ark. 542.  The court *assumed* there was a difficulty.  This should have been left for the jury to determine.  Sackett, Inst. to Juries, sec. 16; 45 Ark 256; 52 *id*. 517.  Instructions based upon a hypothetical state of facts, as to which there is no evidence, are abstract and erroneous.  54 Ark. 339.  It was error to give instruction No. 12.  Defendant was a witness, and was entitled to have his evidence considered by the jury in the same way as the other witnesses.  58 Ark. 362-5.  It was error to single out and give undue prominence to isolated parts of the testimony, while sinking out of view the theory of the defense.  2 Thomp. Trials, sec. 2330, 2331; Sackett's Inst. to Juries, secs. 13, 14; 37 Ark. 333; 14 Heisk (Tenn.), 197.  If there is any evidence to sustain the theory of defendant, it is the duty of the court to instruct on this theory.  Sackett, Inst. etc. to Juries, sec. 15; 50 Ark. 549.  The definition of the judge of murder in the first degree leaves out the words "wilful" and "malicious."  Sand. & H. Dig., sec. 1644; 2 Bish. Cr. Pr. secs. 561-570; 1 *id*. sec. 102.

8.  It was error to allow a communication to be delivered to W. A. Brown, one of the jurors, after the

jury had retired to consider their verdict. 2 Thomps. Trials, sec. 2553.

9. And to allow the jury to separate, 2 *id*. 2548.

*Sam R. Chew*, Prosecuting Attorney, and *E. B. Kinsworthy*, Attorney General, for appellee.

1. The indictment is in conformity with our statute and former decisions. 29 Ark. 166; 34 Ark. 435; 33 S. W. 104; 32 *id*. 81.

2. The special term of the court was properly held. All the powers to hold the court appear of record. 2 Ark. 253–4; 29 *id*. 170; 45 *id*. 452; 32 S. W. 81.

3. It is too late now to urge for the first time that defendant was not present at the time the grand jury was impaneled, etc. 12 Ark. 630; 50 Ark. 543; 55 *id*. 344; 51 *id*. 145; Sand. & H. Dig., sec. 1061. There is nothing to show that appellant was prejudiced. 55 Ark. 342; *Ib*. 369.

4. Motions for continuance are in the sound discretion of the court, and the action of the court will not be disturbed unless it clearly appears the discretion has been abused. 26 Ark. 323; 54 *id*. 244; 57 *id*; 167; 44 *id*. 482.

5. The testimony of Phelps was incompetent, and no diligence is shown to obtain the witness Felts. 38 Ark. 508; 2 Bish. Cr. Pro., secs. 610, 611; 29 Ark. 262–3; *Ib*. 228–9.

6. There was no error in excusing the jurors mentioned. No abuse of discretion is shown. 29 Ark. 22. No one has a right to any particular juror. 35 Ark. 641–3; 50 *id*. 498; 45 *id*. 169–170.

7. No error in permitting Lora Hamilton to testify. 1 Gr. Ev., sec. 367; Whart. Cr. Ev., sec. 366; 25 Ark. 96; *Ib*. 447.

8.  The placing the jury in charge of a bailiff, or permitting them to separate, are matters left to the sound discretion of the judge.    43 Ark. 152; 29 *id.* 253–5.    No improper influences were shown.    12 Ark. 810; 20 *id.* 59–62; *ib.* 47–50.

9.  The evidence fully sustains the verdict.    46 Ark. 142; 47 *id.* 199; 18 *id.* 303; 34 *id.* 632; 31 *id.* 196; 44 *id.* 115; 32 S. W. 81.

10.  The court properly instructed the jury.    Citing 29 Ark. 248; 38 *id.* 304; 25 *id.* 405; 38 *id.* 235; 51 *id.* 192; 40 *id.* 454; 49 *id.* 548; 53 *id.* 516; 58 *id.* 362.

RIDDICK, J., (after stating the facts).    The learned counsel for defendant have set up many grounds why the judgment of the circuit court in this case should be reversed.    We will now proceed to notice such of these grounds as seem to us necessary to consider here.

In the first place, the record shows the facts that gave the circuit judge power to hold the special term of circuit court ordered by him, and at which the defendant was indicted.    It is said that, had the trial of Hamilton commenced at the special term, it could not have been concluded before the commencement of the regular term of the Logan circuit court, and that it would have interfered with that court.    But whether, had the trial commenced at the special term, it could have been concluded before the time of the convening of the Logan circuit court, is a matter concerning which we need not speculate.    The trial did not commence at the special term, and such special term did not in any way interfere with the Logan circuit court.    The validity of the proceedings at such special term cannot be affected by the contention that, if something had occurred that did not occur, the special term would have interfered with the regular term.    Enough for us to know on that point is that the special term did not interfere with any other

*Validity of indictment found at special term.*

term of the court. The motion to quash the indictment on this ground was properly overruled.

*When irregularities waived.* It is further said that the indictment should have been quashed for the reason that Hamilton was not allowed to be present while the grand jury that returned the indictment was being impaneled, and was given no opportunity to challenge grand jurors for cause. Appellant does not show that any grand juror was a prosecutor or witness against him, or that he was prejudiced by not being allowed the opportunity to challenge. Further, he did not make this a ground of his motion to quash in the circuit court, and it is too late to insist upon it now, for it was waived by the plea of not guilty. *Miller* v. *State*, 40 Ark. 492.

*Sufficiency of indictment for murder.* The demurrer to the indictment was properly overruled. When an indictment alleges that the defendant "did unlawfully, wilfully, feloniously, and of his malice aforethought, and after deliberation and premeditation, kill and murder," etc., it is not necessary also to allege that the killing was "malicious," or to use the word "malicious" in addition to the words used. The indictment in this case contains every allegation necessary under our statute to constitute a sufficient indictment for murder in the first degree. *Turner* v. *State*, 61 Ark. 359.

*When not error to refuse continuance.* It was not error to refuse a continuance on account of the absence of witness Felts, by whom defendant claimed that he could show that McAbee had on one occasion made an unprovoked assault upon said Felts with a knife. Such assault, if made, had no connection with the killing of McAbee, and was not competent evidence of the character of McAbee, for it could not be shown that McAbee was a man of violent and uncontrollable passion by proof of particular acts of violence having no connection with the crime under investigation. *Campbell* v. *State*, 38 Ark. 508; 2 Bishop, Cr. Pro.,

sec. 617. Again, there is nothing in the motion or evidence tending to show that Felts was within the jurisdiction of the court, or that his attendance or testimony could have been procured by a continuance of the case.

Neither can we say that the court should have allowed defendant further time to prepare for his trial. It may be that the time allowed Hamilton to prepare for his defense was shorter than customary, but we cannot say that more time was necessary. The killing occurred in a neighborhood where both himself and McAbee were well known. No one besides McAbee and Hamilton was present at the killing. Hamilton was the only living witness of the tragedy, and it was largely a question of whether or not the jury would believe his version of the facts. So far as we can see, every fact tending to throw light on the transaction was presented to the jury. If counsel for defendant had little time after they were retained to prepare for trial, it was mainly the fault of defendant. He was arrested and confined in jail on this charge for several weeks before the court convened, and no reason is shown why he could not have employed counsel earlier than he did. It may be true that there was no urgent reason for calling a special term to try this case. As the regular term was near at hand, it might have been less expensive to the public, and as well in other respects, to have allowed the case to pass till that time; but that was a question within the discretion of the circuit judge, with which we see no reason to interfere. We must repeat the settled rule that motions for continuance are addressed to the sound discretion of the trial judge, and a refusal to grant such a motion is not ground for a new trial, unless it clearly appears to have been an abuse of such discretion, and manifestly operated as a denial of justice. *Thompson* v. *State*, 26 Ark. 326; *Edmonds* v. *State*, 34 Ark. 726;

*Jackson* v. *State*, 54 Ark. 244; *Price* v. *State*, 57 Ark. 167.

Discretion of court in excusing jurors.

Neither the dismissal by the circuit court of a juror from the regular panel on account of the feeble state of the juror's health, nor the rejection of two of the talesmen because they had formed opinions, requires any consideration here, for those matters were clearly within the discretion of the court. *Hurley* v. *State*, 29 Ark. 22; *Wright* v. *State*, 35 Ark. 641; *Mabry* v. *State*, 50 Ark. 498; *Vaughan* v. *State*, 58 Ark. 361.

As to separation of jury.

It is said that the court, against the objection of the defendant, permitted the jurors to separate before the case was finally submitted to them. This also was a matter within the discretion of the court. Sand. & H. Dig., sec. 2236. But in *Johnson* v. *State*, 32 Ark. 309, it was remarked by this court that "such discretion should be exercised, especially in trials for felony, with the utmost caution." The great interest usually taken by the public in trials for offenses punishable by death, and the danger that either the state or defendant may suffer prejudice from such separation of the jurors makes it in our opinion rarely prudent for a court to permit such separation in trials for capital offenses, when either the counsel for the state or defendant objects. It is not always easy in such a case to ascertain the influences to which a separation has subjected the jurors. For this reason, as the defendant objected to the separation of the jurors, we believe that it would have been better to have kept them together. But as the statute leaves this matter to the discretion of the circuit court, and as there is nothing to show that the defendant was prejudiced by the separation, the exception must be overruled, and a new trial on that ground refused.

Objection not raised below.

Another contention is that the court wrongfully permitted witnesses, who described the appearance of

certain tracks made by some one near where the body of deceased lay, to state that these tracks appeared to have been made by a man while squatting, and to indicate opinions as to the position of the man at the time he made the tracks.  It is said that these witnesses got off the stand, squatted, extended their arms and hands, and held themselves in position as if firing a gun; thus intimating to the jury their opinion upon a material point in the case.  But the record does not support this contention.  It is true that after the testimony of several of the witnesses about these tracks follows this state- ment in parenthesis, ''Here witness demonstrated to the jury;'' but what or how he demonstrated is not shown. The record does not show that the defendant or his counsel made any objection to these demonstrations. No exceptions were saved, nor is the matter referred to in the motion for new trial, and it cannot be considered here.  *Johnson* v. *State*, 43 Ark. 391; *Werner* v. *State*, 44 Ark. 122.

The contention that the presiding judge did not, in his charge to the jury, sufficiently define murder in the second degree cannot avail.  He read the statutory definitions of the different degrees of homicide, and the punishment therefor.  In addition thereto, he gave instructions defining murder in the first degree and voluntary manslaughter, and the following instruction: ''If you are satisfied beyond a reasonable doubt that defendant is guilty of murder in some degree, but enter- tain a reasonable doubt as to the degree, you will con- vict only of murder in the second degree.  If you are satisfied beyond a reasonable doubt that defendant is guilty of some grade of criminal homicide, as explained in these instructions, but entertain a reasonable doubt as to whether it is manslaughter or some degree of murder, you will convict only of manslaughter.  If you entertain a reasonable doubt as to whether defendant

Sufficiency of court's charge as to murder in second degree

is guilty of any degree of criminal homicide, explained in these instructions, you will acquit the defendant."

As the circuit judge had defined the crime of murder in the first degree, it is clear that, had the jury entertained a reasonable doubt as to whether defendant was guilty of that degree of homicide, they would have returned either a verdict of some lower degree of homicide, or of not guilty. If there was any defect in the charge on this point, we think that no prejudice resulted to the defendant. In addition to this, it may be said that neither of the instructions requested by defendant contained a satisfactory definition of murder in the second degree. He should have presented a correct instruction if he desired one to be read to the jury on this point.

The contention that the presiding judge, sometime after the jury had retired, recalled them, and read to them a single instruction, defining murder in the first degree, is not supported by the record. The record does show that, after the case was submitted, the jury came in on their own motion, and requested the judge to repeat the instructions, which he did, and also added two other instructions, touching on the question of motive and the failure of the defendant to flee. Both of these instructions were favorable to defendant, and not in any way prejudicial.

Instruction as as to defendant's credibility approved.

It is further contended that the presiding judge erred in telling the jury that they had the right, in considering the testimony of the defendant, to take into consideration his interest in the result of the verdict, in order to determine the proper weight to be given to his testimony. It is unnecessary to set out this instruction, for it is admitted that it states the law correctly, and it is a copy of one given in *Vaughan* v. *State*, 58 Ark. 353. But it is said that the defendant was prejudiced by being thus singled out from the other witnesses. We think

that this contention is not tenable.   In the first place, a
defendant on trial is already singled out by the indict-
ment and the fact that he is on trial and directly inter-
ested in the result.   His position in the trial has already
singled him out, and for this very reason it may be neces-
sary in some cases to give an instruction on this point.
To illustrate, let us suppose a case in which an attorney
for a defendant who has testified argues to the jury that
the defendant of all men best knows the motives that
prompted the act under investigation, and that the
greatest weight should be attached to his testimony.
Let us suppose that the attorney for the state, who looks
at the matter from another standpoint, argues for his side
that a defendant accused of a high crime, especially one
accused of a capital offence, and whose life depends to
some extent on his own testimony, has such a strong in-
ducement to protect himself, if necessary, at the expense
of the truth, that his testimony is entitled to little, if
any, weight, and that the jury should disregard it
entirely.   This is no far-fetched supposition.   Attorneys
have the right to argue the weight to be attached to the
testimony of witnesses, and such arguments are often
heard in the trial courts.   What is the presiding judge
to do in such a case?   Is he to sit silent, and allow the
jury to adopt the advice of that attorney in whom they
have the most confidence, or whose views they feel most
inclined to follow?   We do not think so.   It is the duty
of the judge to instruct the jury in the rules of law by
which the testimony is weighed and its credibility tested.
These rules are simple, and can be easily stated in a way
to prejudice no one.

  The defendant has the right to testify, and the jury
should give his testimony the same impartial considera-
tion that they accord to the testimony of other witnesses.
They should not arbitrarily disregard what he testifies,
simply because he is the defendant, nor, on the other

hand, are they required blindly to receive a fact as true because he says that it is true; but they are to consider his testimony in connection with the other facts in proof, in order to determine whether his statements are true and made in good faith, or made only to avoid conviction. The jury are the exclusive judges of the weight of such testimony. In considering the degree of credit to be given it, they may take into consideration his appearance and manner while testifying, the reasonableness or unreasonableness of his statements, and his interest in the result of the verdict. After a due consideration of his testimony, in connection with the other evidence in the case, they should give it such weight as they may deem it entitled to receive, their sole object being to ascertain the truth.

We do not see that an instruction on this point would prejudice either the state or defendant, but, as jurors are not always highly intelligent, it might in some cases avoid confusion in their minds, and tend to promote the ends of justice. Take the case at bar. The defendant was the only eye-witness of the killing. Was it not proper for the jury to understand clearly that, although no other witness saw or could give the details of that tragedy, yet that they were not bound to take his statements as true, and that it was their duty to determine whether such statements were true or false after a careful consideration thereof in connection with the whole evidence? If it was necessary for them to have this information, it was then not improper for the judge to give it to them. It is true that the judge should be careful not to intimate an opinion as to the weight of the testimony. Such an instruction should be both carefully drawn and read; otherwise, prejudice may result. A high and important trust is imposed by the law upon our circuit judges in this as in many other respects,—that, under all circumstances, they secure to the defendant, as well as the

state, a fair and impartial trial, without favor or prejudice. Of each of them, as of Lord Chief Justice Holt, it should be truly said, that the criminal before him knew that "his judge would wrest no law to destroy him, nor conceal any that would save him." But while, above all men, the judge presiding at a criminal trial should be impartial, yet great injury may be done by restricting his powers too closely. The law must be enforced. "If," says Judge Dillon, "we are to expect satisfactory verdicts, the presiding judge must in his charge make the way of the jury plain and clear, and he must have the power, as well as the legal ability, to do this." The Laws and Jurisprudence of England and America, 127.

While it may be possible to draw an instruction on this point in language more apt than the one given in this case, yet that instruction is copied from one given in the case of *Vaughan* v. *State*, 58 Ark. 362, and which was held not erroneous. The same ruling was made in *Jones* v. *State*, 61 Ark. 102. Although some doubts as to the propriety of such an instruction were expressed in *Vaughan* v. *State*, still we all agree that no error was committed by giving such instruction, while a majority of the judges are of the opinion that it was proper and right to give such an instruction in this case. The decided weight of judicial opinion, as we believe, supports this conclusion. *Jones* v. *State*, 61 Ark. 102; *People* v. *Calvin*, 60 Mich. 123; *People* v. *Knapp*, 71 Cal. 10; *State* v. *Sterrett*, 71 Iowa, 386; *State* v. *Maguire*, 69 Mo. 202; cases cited in *Vaughan* v. *State*, 58 Ark. 365; also 2 Thompson, Trials, sec. 2445, and cases cited.

It is urged that the court did not sufficiently define the right of self-defense. But we need not discuss that question, for there is no evidence to show that defendant acted in self-defense, and nothing upon which to base such an instruction. The defendant, who testified in his

Abstract instruction properly refused.

own behalf, was the only witness of the killing, but he does not say that he killed McAbee to protect himself, or anything from which that fact can be inferred. On this point, he said, in his direct examination: "McAbee told me to get out of his field, and pulled out his knife, and came at me with it, waiving his hand, and saying he would tear me all to pieces. I told him not to come, to stand back. At that time my gun was resting on the ground, on the butt end of the gun. He kept coming at me. So I raised the gun, and fired, when Mr. Abee staggered, and fell backwards. I then walked up in about two feet of him, and stood there a moment or so, and heard him groan a time or two." On cross-examination, he said: "There was no obstruction behind me, to keep me from retreating when the deceased was cutting at me with a knife. I stood there, and raised my gun, and shot him just as he was swaying around like this [here defendant showed how deceased swung his arm around]. The deceased, as I raised my gun, had left the plow eight or ten feet, and I got mad when I saw he was coming at me, and when I raised my gun he swung around, and said, 'Look out there! What are you going to do there?' when I shot him, my gun being in four feet of him." It is to be presumed that defendant stated the facts as favorably to himself as the truth would warrant. But it is plain from his own testimony that McAbee was not at any time within striking distance of him, and that McAbee, by waiving his hand and knife at defendant, was not endeavoring to cut him, but only to intimidate him, and get him to leave the field where McAbee was at work. This act of McAbee aroused the anger of Hamilton. "I got mad," he says, "when I saw he was coming at me." The most favorable view of the facts than can be taken for defendant is that he had no premeditated intention of killing McAbee, but shot him under the influence of a fit of anger, suddenly aroused by the acts and

threats of McAbee in rudely ordering him from the field. Under no reasonable view of the facts could the jury have found that this killing was justifiable.

Finally, it is said that the evidence was not suffi- *State may contradict defendant's statements.* cient to support the verdict. It is argued that the state, having proved the statement of Hamilton, made at the time he borrowed the gun from Dawson, to the effect that he wanted it to shoot ducks, cannot now assert that those statements were false, but is bound by such statements. It is clear that this is not the law. Such statements go to the jury in connection with all other facts and circumstances in proof, and it is for them to decide whether they are true or not, and what conclusions to draw from them. The evidence, we think, was amply sufficient to support the verdict. The defendant, Hamilton, was a young man twenty-six years of age. McAbee was over twice as old, with a right hand so badly crippled that it was of little use. The evidence shows that Hamilton went to McAbee's field, where McAbee was plowing, and there killed him, under circumstances which justified the jury in finding that the killing was not only unnecessary, but that it was intentional and premeditated.

Counsel for defendant say that he owned no property except a hundred bushels of corn, upon which the state claimed a lien; that, on account of the penniless condition of defendant, every step taken by them was under the most adverse circumstances. The question of the right of defendant to use this corn to pay the expenses of his defense is not raised in the record, or before us for decision, but we willingly bear testimony to the fidelity and energy with which counsel for defendant have striven to save the life of this unfortunate man. That their efforts in that direction have been thus far

ineffectual is, in our opinion, due to the fact that the evidence is such as to leave no question of his guilt.

We are convinced that the judgment is right, and it is therefore affirmed.