COOPER *v.* STATE.

4571                                    223 S. W. 2d 507

Opinion delivered October 3, 1949.

Rehearing denied October 31, 1949.

*Vol T. Lindsey,* for appellant.

*Ike Murry,* Attorney General, and *Arnold Adams,* Assistant Attorney General, for appellee.

GRIFFIN SMITH, Chief Justice. Lois Cooper was found dead near Gravette the evening of December 23, 1948. Proximity of an old truck near the city garbage dump where the body was found, the peculiar nature of injuries sustained, contradictory statements by Mrs. Cooper's husband, and unexplained conduct, led to Cooper's arrest on information filed January 7th. He was convicted of first degree murder and given a life sentence.

The motion for a new trial lists twenty-three alleged errors, some of which are not argued.

Matters emphasized by the appellant, upon which he relies for reversal, are listed in the first marginal note.[1]

---

[1] (1) The evidence was insufficient, and an instructed verdict of not guilty should have been given. (2) Gene Thrasher, a juror, stated on his *voir dire* examination that none of the State's witnesses had discussed the case with him, and that he had not formed or expressed an opinion regarding the defendant's guilt, whereas in conversation with a witness, overheard by others, he had said Cooper was guilty and ought to be convicted. (3) Improper evidence was admitted. (a) In particular it is urged that testimony given by Thelma Whitlow, a stenographer, should have been excluded, or, in the alternative, she should have been required to supply the defendant with a transcript of his examination December 29th when the coroner conducted an inquest, all witnesses at the hearing having been sworn. Miss Whitlow, in response to questions directed by the Prosecuting Attorney, read the answers Cooper had given. At that time no accusations had been made. (b) Statements made by Cooper while in an ambulance just before he was treated by Dr. Wilford Wilson were privileged as communications between physician and patient. (c) Paul Adams ought not to have been allowed to testify to the defendant's "relations" with unnamed women over a period of three years from 1937 to 1941; also, that in 1937 Cooper burned an automobile for the purpose of collecting insurance. (d) The Court should have excluded testimony by Roy Stewart regarding tests with a barrel and valve stem, the State's theory being that Mrs. Cooper's skull was fractured with the valve stem of an automobile inner tube attached to an oil drum. (e) The defendant also predicates error upon the Court's action in not permitting him (while examining W. H. Watson, who had testified for the State) to show that he (Cooper) made certain statements when he procured from Watson a long valve stem in exchange for a shorter one. (f) It was error to exclude testimony by others regarding what Cooper had said about procuring the valve stem and the use he intended to make of it. (g) The Court should have admitted testimony regarding questions asked of an insurance agent by Cooper concerning the cash value of a policy on

*First—Sufficiency of the Evidence.*—The first public knowledge that Cooper's truck had been wrecked came when three young men driving south from Sulphur Springs to Gravette heard calls for help a short distance from the city garbage dump. They stopped and saw Cooper prone on the roadside as though in distress. He explained that the pick-up truck he and Mrs. Cooper were using in carting trash from their home had been wrecked; that it had "gone over the bank," or something to that effect, and that Mrs. Cooper was at the bottom of the ravine dead or in a dying condition. When help arrived it was found that the truck had "nosed over" the embankment and had come to a stop at a sharp incline with the front end embedded in the debris and the rear near enough for one standing on the roadside to reach the bumper with his foot. Waste matter in and against which the car was lodged consisted of discarded tin cans, charred remnants, broken glass, wire, etc. The car differential was so close to the ground that a person could not conveniently see under, while at the front there was no space between car and debris. Mrs. Cooper's body was 130 feet down the ravine. One witness testified that she was lying on her right side, with the left foot crossed over the right one, resting on an old automobile tire. This witness observed a cut or wound over the right eye. It had turned black, and was not bleeding.

Appellant was taken to Dr. Wilford Wilson's office. While being examined for injuries, he stated that he and Mrs. Cooper had gone to the dump to dispose of trash. With completion of this task appellant got back into the truck as Mrs. Cooper started the engine. The motor was "racing" violently. Appellant said he at first thought Mrs. Cooper was merely joking and that the accelerator had been purposely depressed, but when she exclaimed, "George, do something," he realized that his wife was alarmed. Just then the machine lunged forward. This

the defendant's life, and whether such value could be used to convert the contract into a paid-up policy. (h) Evidence regarding a so-called "tarp" found near the city dump was improperly excluded. (4) Erroneous instructions were given and instructions to which the defendant was entitled were refused.

witness was not certain that Cooper said he leaned forward for the purpose of turning off the ignition. But, in any event, the statement was made that before anything could be done the car was in motion, and "all of a sudden went over." Cooper claimed to have been hurled through the windshield, while his wife was thrown to the left through an open door. Blood was found on the right-hand "jump seat," and there was blood on the "sill" where the right-hand door "fastens up against it." A subsequent examination of the opening through which Mrs. Cooper was said to have been hurled disclosed that the door functioned imperfectly and would only open half way. A six-inch maple limb, perhaps ten feet long, was tight against the left fender, one end extending into the rubbish pile. The witness who drove Cooper's car to Bentonville December 24th testified that the foot-feed functioned normally for an old car and that neither the throttle nor steering mechanism was out of order, and headlights were in good condition.

A heavy steel Firestone Company drum used for shipping anti-freeze compound was in the rear of the truck. Its capacity is 54 gallons. A nine-inch hard rubber detachable extension of the old-fashioned gear-shift lever, with a heavy two-inch knob, was described by one state witness as "a convertible gearshift knob and blackjack."

Deputy Sheriff John Black [2] testified that tire-marks left by Cooper's truck disclosed movements on the evening of December 23d immediately before the car went over the embankment. According to this witness it was certain that from a point touching some cut-off branches of a plum thicket, the machine proceeded in a southeasterly direction, veering slightly to the left, along an old graveled highway. Skidmarks indicated that the truck had been suddenly started, that it proceeded a distance of 35 or 40 feet, then turned sharply to the left and dropped into the dump, coming to rest when the front end and wheels were impeded by the soft material

[2] Black is the witness whose testimony regarding Cooper's statements in the doctor's office, position of the automobile, the blackjack, barrel, etc., has been referred to.

beneath. Disturbed condition of the gravel for a distance of eight or ten feet convinced the witness that the clutch was suddenly engaged after the engine had been "raced"—supplying, inferentially, a maximum of initial power.

The car windshield had been partially broken by impact from within. Perhaps half of the shatter-proof glass was out and a few pieces were missing when Black gave his testimony. Physical indications were that the break was caused from a blow struck approximately two inches from the bottom of the glass, on the right side. The opening was not, in Black's opinion, sufficient for a man's head to go through.

*Contradictory Statements.*—W. F. Burns, County Coroner, testified that on the evening of December 24th he and Mrs. Burns went to the Veterans Hospital to procure Cooper's permission for having an autopsy. While discussing matters connected with the death, Cooper said that when they drove to the dump he backed the truck to a point selected for unloading. He then got out of the car and Mrs. Cooper backed it about three feet farther. After disposing of the load Cooper took an old piece of canvas and cleaned the truck bed, then told his wife to "pull up." At the same time he put an oil drum in the car, then told Lois to pull up again. The accelerator stuck, causing the machine "to race around rather fast." Appellant says he ran and caught the car as it reached the dump, "jumping into it just as it went over." According to this explanation, the truck went down the hill about 75 feet and stopped suddenly, throwing Cooper through the windshield up to his shoulders, while Lois fell on the driver's side and went under a front wheel. It ran over her neck, and she "gurgled" and didn't speak again.

These representations by Cooper were testified to by Burns and his wife. The former said that he asked Cooper if Lois was insured, and received a negative reply. Burns says he then told Cooper that Clifford Fry, an agent at Gravette, had stated there was a $5,000 policy on Mrs. Cooper's life, with double indemnity in the event of accident. Cooper's reply was: "Yes, I remem-

.ber that now, but it is a savings account policy." Cooper then said to Burns, "If you will sign the ·death certificate·and get me out of this mess, it will be worth half of the five thousand to you." The witness said his understanding of the proposal was that ·the offer related to half of the double indemnity, or $5,000. Mrs. Burns testified ·that she talked with Cooper while her husband was out of the room typing a form authorizing the autopsy, and that Cooper intimated to her that he would pay $10,000 for the assistance inferentially suggested.

*Motive Alleged by State.*—Other than a small contract covering hospitalization, Mrs. Cooper was insured for $8,500 under three policies, each paying double the principal sum if death should be accidental. All were procured in 1948, the oldest July 20, the next October 21, and the last December 6. If realized upon, appellant as beneficiary would receive $17,000.

There was evidence from which the jury could have found that the Coopers were not domestically harmonious, although some witnesses thought they were. At one time the couple had accumulated approximately $6,000, most of it put aside by Mrs. Cooper while her husband was with the armed forces. This, however, had been used, or virtually spent. Cooper operated a radio and electrical repair shop, maintained in a part of the residence he and his wife occupied. They had been married 19 years, and were childless.

Supporting the State's contention that Cooper had grown tired of his wife and had formed other attachments, his connection with a young girl of good family and high scholastic attainment was shown. The girl was eighteen years of age when she testified, but was about seventeen when she met appellant, who soon made "improper advances" which were first repulsed; but, according to the testimony of this witness, Cooper told her "we might later be married.". She was wholly inexperienced in sexual matters, and was so impressed by the attentions paid her and by Cooper's personality and seeming devotion that aloofness gave ·way to mutual desires, and for several months prior to the tragedy there were no inhibitions.

Their first experience consummating intercourse occurred in the basement of Cooper's home under his radio shop. Mrs. Cooper had gone to Joplin. The girl was persuaded by her lover to believe that Mrs. Cooper —represented by her husband to be without sexual reactions—did not object to the character of conduct she and George were engaging in, although there is no suggestion that Mrs. Cooper had specific information in respect of person or persons her husband was turning to. The young witness related a conversation with Cooper in which he expressed a belief that Lois would not live long—possibly not more than two years, that she "might have a stroke," and in that case, said the girl, "We were to be married." Cooper also said that a child conceived as a consequence of his marriage to Lois "had been taken care of" because they were too young to rear it. The witness understood from what Cooper told her that a Doctor R.—had performed an abortion.

Cooper maintained a houseboat on Grand Lake in nearby Oklahoma. It was frequently used when he and his wife, the young witness and her mother and father (and sometimes a brother), went for outings. On such occasions Cooper would take individual members of the group for pleasure trips, being particular, at times, to arrange a private trip for the object of his immediate affections. The boat was provided with conveniences for the entertainment each looked forward to. So was a truck, to which and in which access was occasionally had. The trips, whether by boat or truck, were usually made at night. Some time in 1948 Cooper told the witness she might be wearing a ring before school was out. Respecting consequences of the illicit relations, the witness testified that on at least one occasion she expressed apprehension about being pregnant, or fear that pregnancy would result, but was reassured when Cooper told her "it just wouldn't happen"; he knew how to take care of that. Finally, the witness said that Cooper was the first person who had ever made love to her. Question: "And he professed to love you, and that he was going to marry you?" Answer, "Yes."

*Cause of Death—Circumstantial Evidence.*—While Cooper was in an ambulance, preparatory to entering Dr. Wilford Wilson's office the night Lois was killed, a superficial examination was made to determine whether appellant had sustained serious injuries. The Doctor, (over objections that any statements made by Cooper while he was being treated were privileged) testified that Cooper complained of intense pains in the right arm and shoulder. There were bloodstains on Cooper's face, but no cuts, abrasions, or lacerations on either hand. The Doctor "imagined" the facial stains were from a scratch, but because of Cooper's eligibility to the Veterans Hospital, Dr. Wilson called that institution by telephone and told the physician in charge that a "badly injured man" was being sent over.

In describing to Dr. Wilson circumstances attending the so-called "accident," Cooper said that while at the dump he told his wife to get in the car and start it. When she complied with this direction, the car began "running around." Lois called for help, and Cooper "hopped in and turned off the switch, and just as this was done the machine went over the dump and a barrel in the car hit [me] in the back and knocked [me] through the windshield."

Dr. Stewart Wilson, connected with the Medical Center at Rogers, made autopsies on Mrs. Cooper's body at Pyeatte's Funeral Home in Gravette. There was a deep, ragged laceration on the back of the head, but no blood, in the occipital region. Several minor tears extended out from it, particularly upward. A small amount of blood, tinged with embalming fluid, was found in the hair. Bits of dry leaves and dirt were mixed with the hair, especially in the back. Numerous minor bruises and scratches were "scattered" over the entire body, the more severe being on the anterior surface of the right thigh and about the right eye and mouth. Some dried blood was found in each nostril. In examining the back of the head Dr. Wilson felt "something," and as he expressed it, "I didn't quite know what it was, but when I pulled it out it proved to be a large valve stem, caught on the hair, and more or less tangled with it."

The leaves found in Mrs. Cooper's hair were not stained with blood. Within the chest there were no indications of injury—no blood, nothing to suggest that the body had been crushed. A bruise under the skin caused by force was the result of [subcutaneous] bleeding. No injury to the abdominal walls had been sustained.

In examining the scalp a considerable quantity of clotted blood was found beneath it, without evidence of external bleeding. A small puncture wound through the scalp on the right side of the head was observed, extending inward. "You see," said Dr. Wilson, "the skull bone is in two layers, with soft spongy [matter] between. This punched-out hole went only through the outer table, producing a slight depression or fracture of the inner table. It caused a hemorrhage of the brain approximately two inches in diameter, although the brain structure proper was not lacerated." Assuming the injury to have been caused by the valve stem, a test was made to determine whether the wound corresponded with physical proportions of the metal. By rotating the stem in a way demonstrated to the jury, perfect contact was made.

Two days later Dr. Wilson reëxamined the body, with particular reference to neck, lungs, larynx, trachea, thyroid glands, esophagus, etc., and did not find any evidence of injury; nor were vertebrae or any other parts of the body injured in a manner to have caused death.

In summation of his testimony, Dr. Wilson said:

"The wound higher on the head inflicted by the valve stem [came] first. There was considerable hemorrhage as a result of that injury, indicating that the girl was very much alive at the time. As far as the laceration on the back of the head was concerned, . . . . it occurred either after death or when she was almost dead. I do not think that [the two] were inflicted at the same time. . . . There were bluish-black discolorations involving both eyelids and the surrounding areas, and over the bridge of the nose. In other words, she just had a black eye. . . . There was considerable swelling over the lips, but not much discoloration."

Distance from the valve stem wound to the laceration was approximately four and a half inches. It was the Doctor's opinion that the lower wound was made by "a dull article, [because] it wasn't a clean cut. The skin was more broken than cut."

It was Doctor Wilson's opinion that, primarily, the wound made by the valve stem caused death, and that other injuries were contributory.

*Appellant's Testimony.*—In explanations relating to the oil drum, Cooper testified that he used a gasoline stove in his home. It required repairing, and the drum in his truck the night Mrs. Cooper was killed had been procured for use as a pressure tank. One end contained two openings, a large "tap" or bung approximately two and a quarter inches in diameter, and a smaller threaded hole diagonally across, and near the rim. The small hole had been closed, but the larger tap had been drilled in such manner that a truck valve stem could be inserted and made leak-proof. By this means a foot- or hand-pump could be attached to the stem and air forced into the drum. The drum, when partially filled with fuel, could thus be put under pressure and fuel fed to the stove through pipe connections.

The night Mrs. Cooper lost her life she and appellant put the oil drum in the truck, intending to take it to a filling station for gasoline. Cooper testified that when they arrived at the dump he got out of the car and with the aid of a flashlight gave directions, while Lois backed the machine to a spot where trash was usually unloaded. After getting rid of the load, appellant swept the truck bed, then had Lois pull up about three feet. First, however, he had removed the oil drum, placing it immediately back of the car to hold open the door on the west side. The debris was in sacks, but some sifted through to the car floor. A canvas was used for cleaning purposes. "Then," said the witness, "I set the barrel back in the car, closed the door, ran around, and jumped in, laid the flashlight behind the seat, and we started up normally. I didn't notice anything wrong except that as the motor was 'fed' it started to race.

. . . I thought [Lois] was just playing, (we do that a lot of times: would take off in that [way] and spin the wheels quite a little way); but she made this 'arc,' and she called for me to help her. I reached with my foot for the accelerator and grabbed the key. I broke the [key] chain and had to reach a second time to turn off [the ignition]—I believe I got it turned off, but can't swear to it—because at the same time I got it (I turned the key off) this car went off the embankment with the lights still shining in front. It looked like a black hole down there with no bottom to it. I threw one arm in front of me (indicating) and the car seemed to hit with its front end.''

The witness then said he struck his head on the windshield, in consequence of which a tip of the nose was cut off. He added, further, that there were scratches on the side of his face, a split place on the mouth (presumptively caused when a tooth cut it), and ''I cut my neck trying to get my head back through the windshield. It 'bulged out' where I tried to get my head back, forming a trap. I had to take my hand and push [the glass] to the side to get my head out.''

The next thing appellant could remember, he was sitting or squatting on the right side of the car. He was outside ''feeling his face'' until Lois called:—''I then went back through the car. The seats were turned down and this barrel was crossway on top of the back of them. I pushed [the seats] back and pushed the barrel back in the truck and went *through* to her.''

Lois, appellant said, was lying on her face ''practically'' in front of the left front wheel. The following details were given: ''I tried to pick her up, but the left arm was numb. It wouldn't work—just felt like it belonged to some one else. I put her left arm around my neck and tried to pick her up, and couldn't. Then I turned her over and put both arms around my neck and told her to hold on. At that time the car came forward and the front of the fender hit me and also seemed to catch her. She [said something like] 'don't give up,' or 'don't leave me.' I tried to extricate her by digging

cans out from under her; it seemed like the front wheel had her caught, like it was coming across from the left side. . . . Then [after digging cans] I got a pole that had a piece of wire on it and tried to pry the car up to get her away. . . . The wheel didn't seem to hurt her. She could talk to me and she actually did, but those [few] words were all I can recall. Well, [the car wheel] didn't seem to be on her real tight, . . . but I couldn't get her loose: then she made a funny noise. I thought it had crushed her or something. It was a gurgling sound in her throat. I took my left hand and wiped off the side of her face and got a whole handful of blood."

Appellant said that after continuing unsuccessfully to give relief, he went "back in the truck" and hunted for the flashlight, but couldn't find it. Being "half crazy" with fear and apprehension, he tried to start the car "and drive it off down in there to get it off of her. It wouldn't start, but the effort seemingly caused the flashlight to fall on the floor board. I grabbed it and went back [to Lois] and found she wasn't pinned very tight. I got her by the hair of the head, and then, when she did come out from under it, a lot of cans came out with her, and we all fell off right in front of the wheel. There was almost a sheer drop for several feet, and I fell backward and took her with me. I fell more than once."

Cooper, when asked by his attorney regarding these movements, replied that he had formerly made the statement that the fall was about 70 feet. He had tried twice to pick Lois up, but fell both times. As a result of the first attempt they rolled a little way. After trying a second time, he placed Lois on the ground, straightened up her clothes, then went for help. He claimed that at that time he was unable to stand alone, and had to crawl to the highway.

Appellant remained approximately two weeks in Veterans Hospital. Dr. Mulkey testified that he first saw Cooper the night of December 25th. The patient appeared to be in considerable distress and complained of pains in the lower portion of his back and in the right

shoulder. There were numerous scratches about his face—"rather deep scratches, bruises and abrasions." On his shoulder there were contusions. The back muscles were rather stiff. At times the shoulder was dislocated, but on other occasions it was not. The Doctor thought this might be accounted for by the position of the patient's arm when examinations were made. Urinary tests showed traces of blood cells, indicating a kidney injury, new or old.

*Notes Taken at the Inquest.*—Appellant complains that stenographic notes of his testimony, given at the inquest, were improperly admitted—a matter treated under a different heading in this opinion. According to this evidence, appellant was driving the truck when the dump was reached, and turned to the south; but his wife backed it to a designated position—a distance of perhaps three feet. Appellant didn't know of any [tree or bush limbs] that were in the way. While standing at or near the back of the truck he threw to the ground, or dropped, the canvas with which the car was cleaned after the trash had been disposed of, then placed the oil drum in the truck in an upright position. The motor was running when Lois "pulled up a little to let me clean out [the bed]".

Appellant further testified that the truck was not in motion when he got back into it. First, ["originally"] the car started slowly. Cooper had stated that Lois was a good driver, and he appears to have repeated the statement that she was at the wheel, that the headlights were on, and that when they got to "the hill" the car "couldn't have been going very fast [because] it was in low or second gear."

A sudden stop, Cooper testified, caused him to "run his head *into* the windshield." He didn't know whether his head actually went through the glass, but it caught him "back of the ears here when I tried to get out." After the impact Lois told him she was "bad hurt." Then he said: "I started to pick her up and the car dropped something like two feet. The upper part of the window caught my shoulder, and up in the front

where the bumper and the springs are fastened on and caught on the back of her head—it looked like her neck— and I dragged her back from under that and got her turned over, and the car kept 'settling' on me—[came down a second time]. It didn't make any sudden move; just gradually came on down and caught—I think it was —her clothing, but I couldn't get her out. It came down over the top part, on her neck, or somewhere along in here," (indicating).

Cooper said he was trying his best to hold the wheel off of his wife's body, "and when it got on her it didn't seem to hurt so bad, [for] she could still talk to me; then something 'gave' under the car. I was digging the cans out and it smashed my thumb and caught me for a little while, but I got loose. . . . When it passed down she made gurgling sounds and never did talk to me any more, and I lost my head, I guess. [Then] I got in the car and tried to drive it off—tried to lift on the back bumper, and it was going on over the dump. I went around the car and hunted for a pole or anything I could get to pry with, then I got her by the hair of the head and by the coat, and pulled. [But just before that time] the car wheel was on her left chest: had rolled over her—no, it came across this way," (indicating the neck).

There was repetition of the statement that when Lois was extricated "they both went to the bottom [of the ravine]". Appellant "guessed" that an hour—"I don't believe it was over that"—elapsed between the time the car went over the embankment "until we landed down the hill." During that period he frantically dug in the debris with both hands.

Touching upon domestic relations, appellant testified that he didn't remember any difficulty of a serious nature. On two occasions he had slapped Lois and had once broken her glasses. Regarding the young lady who told of their sexual escapades, appellant admitted that he "worshiped" her, but coupled with this declaration was the assertion that his wife was also fond of the girl, and that the attachment sprang from the circumstance

that the child they lost (had it lived) would have been the same age. At another period in his inquest-testimony, appellant said, "I am not hurt: I'm not complaining one bit."

*Summation of Factual Status.*—When full effect is given the rule that the demeanor of a witness who is heard by a jury may be taken into consideration, that a hesitant, halting, or evasive manner may at times reflect actuality with as much conviction as might be shown by affirmative statements; and when the contradictory nature of appellant's different explanations is compared with rationale reached by the medical experts, the conclusion, then, is inescapable that there was substantial basis for the verdict. There was positive testimony that death was caused by the head wound,—a wound, as Dr. Wilson said, that corresponded in area and in other respects with the valve stem.

The jury was warranted in believing from Cooper's lack of frankness, and want of consistency with explanations, that the truck was intentionally wrecked. Condition of the skid marks sustains the State's theory that Cooper, not Lois, started the engine when the truck was at a standstill, accelerated the motor to such an extent that when the clutch was engaged the rear tires "spun" momentarily before gripping the ground, and that during this transaction Cooper steered the machine in a comparatively straight line until speed had been acquired, then pulled sharply to the left as he sought personal safety. The oil drum was in a position to have fallen against Mrs. Cooper's head; and in fact it did fall. The "bung" or tap admittedly prepared by appellant for reception of the valve stem was broken, and the stem was in Mrs. Cooper's hair. A witness who drove by the rubbish dump at a time Cooper claims to have been trying to free his wife testified in a manner supplying negative contradiction of appellant's assertions.

Some witnesses thought Cooper had a "trick" shoulder, and they testified he had been known to dislocate the member to entertain his friends. The fact-finders no doubt (and they had a right to do this)

weighed the evidence of witnesses whose testimony was contradictory respecting the condition of appellant's hands following his alleged endeavor to dig in the debris where broken glass, tin cans, and sharp-edged or abrasive substances would have left their marks. There does not appear to have been a satisfactory answer to the natural inquiry, Why, if Cooper fell twice with his wife, or rolled down a precipitate embankment more than a hundred feet, were her garments, (including hose) virtually intact, and why did Cooper's wearing apparel show so little evidence of hard usage?

If Mrs. Cooper's death was caused by the valve stem when it was driven into her head as the oil drum fell against her, death was almost instantaneous. This was the Doctor's conclusion, hence conversations such as appellant testified to were highly improbable. The insurance, with double indemnity if death occurred through accidental means,—policies procured in recent months with annual premiums of more than $500—and admitted liaison with an immature girl who returned appellant's affections and had received his assurance that his wife would not live long; his reference to marriage and a wedding ring before school closed; the inferential offer of $5,000 to a coroner if he would assist in lifting the burden of suspicion; appellant's statement to witnesses who told him the girl friend had admitted their illicit relations, "Well, it's all over now: I hope you electrocute me; . . . . I'm ready to plead guilty",[3]—these facts and circumstances, when considered as a whole, could not be dismissed as baseless suspicion upon which accusation had been predicated.

The record covers more than 1,200 pages. Testimony has only been touched on in this review, each side having produced numerous witnesses. Our conclusions are that facts were sufficient for the jury to find that a motive existed, and that a predetermined course of action was pursued when the truck was driven to the

---

[3] This statement was materially weakened on cross-examination when the witness said appellant's language probably was, "I want to plead guilty; I am ready to be electrocuted; I'm ready to go, but I didn't kill Lois, [but] I want to plead guilty and get it over with."

dump. It follows that appellant's contention that the evidence was insufficient must be overruled.

*Second—Competency of Juror Gene Thrasher.*—On *voir dire* a list of all witnesses was read and prospective jurors were asked if they had discussed the case with any of them, or if, independently, they had formed or expressed an opinion. All who were accepted gave negative answers. In the motion for a new trial it was charged that Thrasher had talked with the Coroner and had been shown the valve stem found in Mrs. Cooper's head. Two witnesses, whose testimony at the hearing on appellant's motion to vacate the verdict was materially weakened on cross-examination, and one who asserted without equivocation that Thrasher had said Cooper was guilty and should be electrocuted, were used by the defendant to show that the juror had fraudulently procured a place on the panel.

Although statements made by these witnesses were not countered by the State, their assertions were heard by the same Judge before whom the original examinations were conducted. Thrasher had said he could and would give the defendant the benefit of all reasonable doubts, that he would be guided solely by evidence adduced at the trial, and that any preconceived ideas would be disregarded.

Courts properly examine very carefully into assertions made by witnesses who, after a defendant has been convicted, come forward with what they insist were beliefs expressed in circumstances from which bias or prejudice against the accused may be inferred. Weeks and months sometimes lapse between trial and what such witnesses say were remarks made at a time when the accused's status was being discussed. Because of the personal interest a volunteer may have in serving a defendant, and because the exact words used at a remote period, or the general import of a conversation, may later be purposely or unintentionally exaggerated, courts are given a broad discretion in determining (a) whether the evidence has been inspired through friendship for the defendant, (b) whether prejudice against

the State's representatives has induced the course of conduct, (c) whether memory of those testifying is at fault, and (d) whether, if true, the attributed declarations were anything more than random comment. If the latter, and the proffered juror convinces the Court that, as in the case at bar, he *has* tried the issues fairly and treated the facts with reasonable consideration, the motion to quash should be denied. Judges are not compelled to accept *all* testimony as true, even though it is not *expressly* traversed. The manner in which a witness acts on the stand, his general demeanor, the apparent presence of interest or an effort to serve some one,—these may deprive sworn statements of substantial characteristics; and in the exercise of a sound discretion the Judge who listens to such witnesses must resolve conflicting inferences and act as he conscientiously believes the circumstances warrant. We are not willing, in the instant case, to say that this discretion was abused.

*Third—Improper Evidence.* — When appellant objected to the Court's action in permitting Thelma Whitlow to verify, and testify from, the stenographic record she had made of appellant's examination at the inquest, he asked—in the alternative—that *all* the record be made available. When overruled he excepted. The Coroner's hearing was conducted December 29th. At that time Cooper had not been formally accused, nor is there evidence that the information had been drawn. It was filed January 7th.

Under authority of *Cole* v. *State,* 59 Ark. 50, 26 S. W. 377, appellant thinks prejudice resulted when excerpts from his testimony, as distinguished from a transcript of the entire examination, were admitted. But the Cole case does not stand for that proposition. It merely holds that where the purpose was to impeach the defendant, the transcribed testimony was the best evidence—not what a bystander thought he remembered the testimony to have been. Chief Justice BUNN, who wrote the opinion, said the better practice would be to produce the entire written record. We agree that complete fairness sustains this course. A prejudicial situation might be

reflected if appellant had shown by something more convincing than an objection that he was being placed at a disadvantage, in that emphasis was lost or the tenor affected for want of continuity when the Prosecuting Attorney selected questions and answers at random. This is not true here.

The Cole case was partially construed in *Guardian Life Insurance Company* v. *Dixon,* 152 Ark. 597, 240 S. W. 25, Judge HART's statement being that the cited case was a criminal proceeding ''in which Cole was present at the Coroner's inquest and was suspected of being guilty of the homicide. Subsequently he was indicted for the murder of the deceased, and on his trial the court held that it was competent for the State to show what he had testified to at the Coroner's inquest because he was a party to it.'' See *Tiner* v. *State,* 110 Ark. 251, 161 S. W. 195; *Anderson* v. *State,* 197 Ark. 600, 124 S. W. 2d 216. In *Brown* v. *State,* 208 Ark. 28, 184 S. W. 2d 805, it was held that statements made by a claimant before Workmen's Compensation Commission regarding how a homicide occurred were admissible against him when he was subsequently indicted or informed against for murder, ''in the absence of a showing that he objected to being made a witness or that improper means were employed to procure the statements.''

An early leading case involving admissibility of testimony given at a Coroner's inquest is *People* v. *Molineaux,* 168 N. Y. 264, 61 N. E. 286, 62 L. R. A. (1904) 193. It was said that one called as a mere witness, who fails to claim a privilege on the ground that the testimony may tend to incriminate him, cannot object to its introduction at his subsequent trial for the commission of the crime originally under investigation.

Some of the matters complained of under subdivision (3) were not preserved by exceptions.

The contention that Dr. Wilford Wilson was appellant's physician when he made an examination the night of December 23d, if conceded, would not make reception of the statements erroneous under Ark. Stat. (1947), § 28-607, Pope's Digest, § 5159. The admissions were not

made for the purpose of supplying the physician with information necessary to any treatment. *St. Louis, I. M. & S. R. Co.* v. *Fuqua,* 114 Ark. 112, 169 S. W. 786. The exclusion of certain other testimony was objected to by appellant, but it was clearly self-serving and the Court acted correctly as to it.

*Fourth—Instructions.*—It is strenuously urged that Instruction No. 13 did not correctly declare the law. It told the jury that where the State relied entirely upon circumstantial evidence, "it is necessary in order to convict . . . not only that such chain of circumstances as a matter of law should point to and be consistent with the defendant's guilt, but that [the circumstances] should be inconsistent with any other reasonable hypothesis. That does not mean any more than this: that the facts and circumstances in the whole case, taken together,—if they convince you beyond a reasonable doubt of the guilt of the defendant, [they are] sufficient to convict him. If they do not convince you beyond a reasonable doubt, [they] are not sufficient to convict him, and you should acquit the defendant."

Specific objection was that the instruction did not tell the jury the State's proof "must be so convincing of [the defendant's guilt] as to exclude every other reasonable hypothesis."

The defendant was not entitled to the modification suggested. *Bartlett* v. *State,* 140 Ark. 553, 216 S. W. 33; *Bost* v. *State,* 140 Ark. 254, 215 S. W. 615; *Trammell* v. *State,* 193 Ark. 21, 97 S. W. 2d 902. The Trammell case approves an instruction in the exact language used in the case at bar.

Other instructions given, and those tendered and refused, have been examined. We do not find that error was committed, and the judgment is affirmed.

Mr. Justice George Rose Smith dissents.

George Rose Smith, J., dissenting. I disagree with the majority in only one respect. Thelma Whitlow acted as the reporter at the coroner's inquest and was a witness at the trial below. The State elicited from her many

excerpts from appellant's testimony at the inquest. The prosecutor's questions usually began with words, "Did he say. . . .", and were so framed that the jury heard only the precise words that the prosecuting attorney selected. A typical question and answer were: "Did he say whether or not after he got her out on her back the car kept coming on slowly and finally came across her chest gradually?" "He said that it did."

It is evident that this procedure entails a possibility of real unfairness to the defendant. The State could, by choosing short excerpts from the former testimony, introduce statements that would appear to be far more damaging to the accused than they would seem if the context were known. For this reason it is the rule that, if the State introduces an admission or confession made by the accused, he in turn may introduce whatever explanatory statements were made at the same time. *Williams* v. *State,* 69 Ark. 599, 65 S. W. 103. For instance, if the State should prove that the accused said, "I killed my wife," he may of course show that the entire sentence was, "I deny that I killed my wife," or that it was, "I killed my wife, but it was an accident."

In this case the appellant asked that the entire record of his earlier testimony be put in evidence; I agree that the request was properly denied. But the appellant's attorney then asked that he be permitted to examine the transcript from which the excerpts were taken. I think it was error to refuse this request. The statute directs that the transcript of the proceedings at the inquest be turned over to the prosecuting attorney. Ark. Stats. (1947), § 42-325. The accused is not supplied with a copy. He cannot in fairness be expected to remember every word that he said at the inquest some months before. A belated explanation from the witness stand would not appeal to the jury nearly so strongly as would proof that the explanation had been made in the first instance. Thus if the accused is denied access to the transcript from which excerpts are read, his right to introduce contemporaneous explanations is actually destroyed. I think that we have now sanctioned a pro-

cedure by which the State in some cases might distort even an assertion of innocence into a confession of guilt.