SMITH *v.* STATE.

4845                                           299 S. W. 2d 52

## Opinion delivered February 11, 1957.

[Rehearing denied March 18, 1957.]

*James E. Stein, Floyd E. Stein* and *John F. Gibson,* for appellant.

*Tom Gentry,* Attorney General; *Thorp Thomas,* Asst. Attorney General, for appellee.

ED. F. McFADDIN, Associate Justice.    Appellant, B. N. ("Bill") Smith, was convicted of murder in the

first degree for the homicide of Buck Layne; and the jury fixed the punishment at life imprisonment. The motion for new trial contains forty-one assignments, which we group and discuss in topic headings:

I. *Sufficiency Of The Evidence.* Viewing the evidence in the light most favorable to the verdict,[1] the facts appear as herein recited. On October 29, 1955, the badly decomposed body of Buck Layne was found in a secluded section of woodland near the "old Ben Thomas place" off of Highway No. 8 in Dallas County. There was evidence of an injury to the skull. Tracks indicated a vehicle had backed from the road to the place where the body was found. It was the opinion of the state medical examiner, after performing an autopsy, that death had been caused by the force of a blunt instrument striking the head and that the date of the death was about October 20, 1955, with a possible variance of 24 hours earlier or later.

The last day that Layne was seen alive was on October 19, 1955, and the last person seen with Layne was the appellant, Bill Smith, who was frequently interrogated before he was arrested. Blood was found on the leather boots that Smith admitted that he wore on October 19th. Buck Layne and Bill Smith were long time acquaintances, and each was engaged in some phase of the livestock business. Layne was working on a profit-dividing basis with L. H. Campbell, who was furnishing the money for their operations. On October 17, 1955 Layne and Smith went together to Eastern Arkansas to fix Layne's truck. They spent Tuesday night, October 18th, at Marvell, Arkansas, and then proceeded to Fordyce on October 19th in Smith's truck, with Layne's horses and mules and saddle in the truck.

While in Fordyce they purchased some Vodka and Layne became intoxicated. He unloaded his livestock at Barner's Stockyard, but was unable to make a sale. Layne and Smith then reloaded the livestock into Smith's

---

[1] This is the rule on appeal in cases such as this. See *Allgood* v. *State*, 206 Ark. 699, 177 S. W. 2d 928, and cases there cited.

truck in the late afternoon and Smith and Layne were last seen together in Smith's truck in Fordyce.

Burke Hodnett testified that shortly after five o'clock in the afternoon of that day, he saw a truck driving on old Highway No. 8. Hodnett, driving his own car, followed the truck until it turned off on a small road leading toward the "old Ben Thomas place." Hodnett testified that the truck looked like Smith's truck because of the unusual construction of its bed.

When Layne failed to return to Little Rock with the livestock on October 19th, his business associate, L. H. Campbell, went in search of him, and when Campbell reached El Dorado on October 20th he found that Bill Smith had sold Layne's horses and mules in El Dorado and still had Layne's saddle. Smith's explanation as to how he came into possession of the livestock was, that he cancelled a $125.00 debt which Layne owed him and, in addition, had given Layne "fifteen $20.00 bills" for the livestock. As to the saddle, he said that Layne failed to take it when Layne left him to go off with a white man named Henry and an unnamed Negro in the late afternoon of October 19th. Smith was entirely unsubstantiated as to the identity or the existence of Henry or the Negro. Smith also had deposited, to his own account in an El Dorado bank, a $50.00 check that Layne had endorsed.

An El Dorado policeman, Monroe Taylor, testified that on August 27, 1955, Smith came to the police station shortly after midnight and told Taylor that Smith was having trouble with his wife; that he had just seen his wife and Layne on the highway, but their car had eluded him. Taylor testified that Smith told him that he would "take care" of Layne later. The jury viewed the place where the body of Layne was found, and also viewed Smith's truck and certain tools that were said to have been in the truck.

We have sketched enough of the evidence to clearly demonstrate that it was sufficient to take the case to the jury and to support the jury verdict. For some of our

cases involving circumstantial evidence see: *Edmonds v. State,* 34 Ark. 720; *Butler v. State,* 63 S. W. 46;[2] *Hogue v. State,* 93 Ark. 316, 124 S. W. 783, 130 S. W. 167; and *Osborne v. State,* 181 Ark. 661, 27 S. W. 2d 783.

II. *Defendant's Requested Instruction On Circumstantial Evidence.* The appellant claims that the Trial Court committed reversible error in refusing defendant's requested Instruction No. 2 on circumstantial evidence. The Court refused the said Instruction No. 2 because the Court gave its own Instruction No. 21 on circumstantial evidence, which reads:

"You are instructed that evidence is of two kinds, namely, direct or positive, and circumstantial, and that any fact in the case or any element of the crime charged may be proved by either kind or by both kinds of evidence; and if any fact in this case or any element necessary to constitute the crime charged, has been established to your satisfaction beyond a reasonable doubt by either direct or circumstantial evidence, or by both kinds, then such fact or element has been sufficiently proved, and if upon a consideration of all the facts proved in the case you believe beyond a reasonable doubt that the defendant is guilty as charged, it is your duty to so find."

The Court also instructed the jury as to: (a) burden of proof; (b) reasonable doubt; and (c) presumption of innocence. In *Trammell v. State,* 193 Ark. 21, 97 S. W. 2d 902, we cited the earlier case of *Jones v. State,* 61 Ark. 88, 32 S. W. 81, and then affirmed this language:

"It is not error to refuse an instruction that, before the defendant can be convicted of murder upon circumstantial testimony, the jury must find that the circumstances proved establish the guilt of the defendant to the exclusion of every other reasonable hypothesis, if the jury were properly instructed as to the burden of proof resting upon the State and as to reasonable doubt." The Trial Court committed no error in refusing the defendant's requested Instruction No. 2. See also *Cranford v. State,* 156 Ark. 39, 245 S. W. 189; *Osborne v. State,*

---

[2] This case is not officially reported. See 69 Ark. 659.

181 Ark. 661, 27 S. W. 2d 783; and *Cooper* v. *State,* 215 Ark. 732, 223 S. W. 2d 507.

III. *Separation Of The Jury.* The trial began on January 9th and the jury verdict was not returned until January 13th.[3] During the course of the trial, and before the case was finally submitted to the jury, the Court permitted the jurors to separate and in some instances the appellant's counsel objected, asking that the jury be kept together and the jurors not allowed to go to their homes at night.

We find no error in the rulings of the Trial Court allowing the jurors to separate. The Court duly and properly admonished the jury before each separation. Section 43-2121 Ark. Stats. says in part: "The jurors, before the case is submitted to them, may, in the discretion of the court, be permitted to separate . . ." See *Hamilton* v. *State,* 62 Ark. 543, 36 S. W. 1054; and *Borland* v. *State,* 158 Ark. 37, 249 S. W. 591.

IV. *Prejudice and Bias Of The Trial Court.* Appellant's counsel grouped incidents to support the argument on this matter. We quote the pertinent portions of the record in regard to each incident.

(a) When the State (Prosecuting Attorney, Mr. Linder) was examining the witness, Paul McDonald (State Policeman), on direct examination regarding what the defendant, Bill Smith, was reported to have said to the witness, the following occurred:

"Q. How many occasions beside that time did you ask him if he was on Highway 8 on that day?

A. My first contact with Bill Smith a few days before his arrest he was asked those questions and after his arrest he was again asked with the same answers.

Q. And you have told this jury that he said he was never on Highway 8 and that nobody else was in possession of his truck that day?

---

[3] The record is voluminous, containing more than 650 pages.

BY MR. STEIN: If we would stop the repetition of asking the witness a question and having the witness answer it and then go back over it it would save time.

BY THE COURT: If you will quit interfering.

BY MR. STEIN: I have a right to make my objections.

BY THE COURT: All right, you sit down.

BY MR. STEIN: I want to object to the remarks of the Court as prejudicial to the defendant and state further that I have a right to make objections at such times as I think necessary and that it is embarrassing to me and it is prejudicial to reprimand me before the jury for making an objection.

BY THE COURT: No reprimand has been made. Proceed.

BY MR. LINDER:

Q. Did you ask him any questions concerning whether or not he and Buck Layne were together on October 19, 1955?

A. Yes, sir.

Q. What was his answer to that?

A. He stated that they were together all during that day.''

Appellant's counsel in their brief object most vigorously to the Court's words: ''All right, you sit down.'' These words, standing alone and out of context, might either be a violent command or a polite agreement, depending on the tone of voice and manner of speaking. But in the record here before us, with the full surroundings shown — as we have by the excerpt — it is clear that there was no reflection on counsel and no reprimand. In fact, the language of the Court — ''No reprimand has been made. Proceed.'' — removes any inference of a reflection toward appellant's counsel.

(b) Again, near the end of 27 pages of cross-examination by appellant's counsel of the State's witness, Hodnett, the following occurred:

"Q. And you are relying upon her memory in fixing this date as Wednesday and not your own, isn't that correct, Sir? You are telling this jury here this afternoon (interrupted)

BY THE COURT: Don't make a speech, Mr. Gibson. Ask the gentleman a question and let him answer.

A. (By Mr. Gibson:—) (continues) that you saw a truck on Wednesday, but isn't it a fact that the only way that you know this day, whether it was Wednesday or Thursday, is by what your wife told you?

A. I saw the truck on Wednesday.

Q. But you didn't know whether it was Wednesday or Thursday, you have told me that too, haven't you?

A. That's right."

The Court said: "Don't make a speech, Mr. Gibson. Ask the gentleman a question and let him answer." This was just another way of asking counsel to rephrase the question so as to make it less argumentative. That the remark of the Court was not considered at the time by counsel to be any kind of reflection is shown by the fact that no objection was saved.

(c) Again, in the testimony of the defendant, Bill Smith, regarding his efforts in repairing Layne's truck over in Eastern Arkansas on October 17th, the following occurred:

"Q. How long were you fixing the truck?

A. We got there about 12 and left about dark. After I drove this axle out, in driving this axle out it swelled the housing, it was stuck to the housing, and stuck to the housing where the bearing wouldn't — this bearing had to go jam up against it, and this bearing wouldn't slip up on the housing and I had to file that housing down enough that that bearing would go on and then that

housing run hot and the nuts didn't want to go back on the housing.

BY THE COURT: I want to know what the nuts up there have to do with this trial.

DEFENDANT OBJECTS TO THE STATEMENT OF THE COURT.

BY MR. STEIN:—

Q. Go ahead.

A. While I was filing this housing I asked them to run these nuts up on this housing. While I was sitting there filing this housing where those nuts would screw up easy enough I could screw them with my hand, and then had to use the big Stillson wrench, and I was working this Stillson wrench and Buck was holding the nut, and at that time Buck skinned his hand a little bit, let the wrench slip.

Q. Was his hand bleeding?

A. Yes, and I was sitting down on it and Buck said, 'I am not going to work any more.' And he said, 'If you can fix it, fix it, and if you can't, let it go.' I said, 'I am going to fix it. I have come to fix it for you.'

Q. How long did you work on it?

A. Started about 12 and got it going just about dark that night."

It is urged by the appellant's counsel that the prejudice and bias of the Court is shown by the Court's statement, as above copied, "I want to know what the nuts up there have to do with this trial." We think the question by the Court was beneficial to the appellant's case. Because of the question, the defendant went on to state that because the nuts were hard to adjust on the housing, Buck Layne skinned his hand; and this offered an explanation for the presence of blood. Furthermore, the fact that the nuts were difficult to adjust, also tended to explain the time consumed in repairing the truck on October 17th.

340

We cannot see any bias or prejudice on the part of the Trial Court by reason of any of the three remarks which we have copied into the opinion; and these are the only three instances of bias and prejudice that appellant's counsel have argued in their brief. We have dwelled in considerable detail on this point of bias and prejudice because we emphasize that Courts and Judges must always see that every person receives a fair and impartial trial before a fair and impartial jury. The Courts are the last bulwark of freedom and justice; and Judges must always act fairly and impartially. We conclude that the appellant received a fair and impartial trial.

V. *Other Assignments.* We have carefully considered all of the other assignments in the appellant's motion for new trial and find none which would justify reversal of the judgment.

Affirmed.