ADAMS *v*. STATE.

Opinion delivered April 18, 1927.

1. CRIMINAL LAW—PRESUMPTION IN FAVOR OF VERDICT.—On appeal from a conviction of murder in the first degree, in passing on the assignment of error in submitting the question of guilt of any degree of murder to the jury, evidence must be given its highest probative value.

2. HOMICIDE—MURDER—SUFFICIENCY OF EVIDENCE.—In a murder trial, evidence *held* to justify submission to the jury of defendant's guilt of murder in the first degree, and to support a conviction therefor.

3. HOMICIDE—REFUSAL OF INSTRUCTION AS TO RIGHTS OF OFFICER.—In a prosecution for murder of a deputy sheriff the court erred

in refusing to charge that, if the sheriff and his deputy did not go into defendant's store to arrest defendant for a felony, the sheriff and his deputy had no other or better rights in the store at the time than any private individual.

4.  HOMICIDE—REFUSAL OF INSTRUCTION AS TO RIGHTS OF OFFICER.—An instruction in a murder case that, if the defendant, at the time of the shooting, when the sheriff and his deputy came into the house, was not disturbing the peace or was not attempting to commit a misdemeanor, or an assault of any kind upon any party, neither the sheriff nor his deputy had any right to arrest him, and if they, or either of them, did shoot at the defendant, the party so shooting, whether the sheriff or his deputy, was violating the law and was aggressor in the fight.

5.  CRIMINAL LAW—ORDER OF RECEPTION OF EVIDENCE.—A conviction will not be reversed for the order in which the State's testimony was introduced, in the absence of a showing of abuse of the trial court's discretion.

6.  CRIMINAL LAW—ORDER OF INTRODUCTION OF EVIDENCE.—In a prosecution for murder in the first degree, testimony of the State's witness, relied on to show malice and deliberation, should have been offered as a part of the main case, and not in rebuttal.

Appeal from Lafayette Circuit Court; *James H. McCollum,* Judge; reversed.

*Luke Monroe, Searcy & Searcy, Carter & Carter* and *James D. Head,* for appellant.

*H. W. Applegate,* Attorney General, and *John L. Carter,* Assistant, for appellee.

SMITH, J.  Appellant was indicted for the crime of murder in the first degree, alleged to have been committed by shooting and killing one Bob Smith, and, upon his trial, was convicted of that charge and given a life sentence in the penitentiary.

Numerous errors are assigned for the reversal of the judgment of the court below, and, among others, that the undisputed testimony shows that appellant was not guilty of murder in either the first or the second degree, and that the court erred in submitting the question of his guilt of any degree of murder to the jury.

In passing upon this assignment of error, we must, of course, give to the evidence which tends to support that charge its highest probative value, and, when thus

viewed, the testimony may be summarized as follows: In October, 1925, appellant, who had previously served as chief of police of the city of Texarkana, and Virgil Grigson, who was, at the time, constable of the township in which that city is located, were engaged in the retail meat and grocery business in Texarkana. Grigson had invested about $3,000 in the business and appellant about $160. They had disagreed and had quarreled, and, on and prior to the day on which Smith was killed, both had been drinking heavily.

On the morning of the killing appellant went to the home of Osborne Carpenter to get a large pistol, which he had previously exchanged with Carpenter for a smaller one, and, in examining the pistol to ascertain whether it was loaded, it was accidentally discharged. Appellant told Carpenter he wanted the pistol to shoot beeves with, as he had only a single-action one, and, on one occasion, he had shot a beef with a smaller gun, and the bullet had glanced off the head of the beef and came near hitting the man who was employed to help appellant butcher the beef. In addition to this pistol, Grigson had a Winchester rifle, which was kept at the store for the same purpose. Grigson and appellant had a quarrel in the store, and appellant and his sons took· Grigson's pistol away from him. Appellant offered several times that day to fight Grigson, but the challenge was not accepted.

Grigson attempted to telephone the police from the store, but appellant refused to permit him to use the telephone. Grigson directed his son to call the police, but the sons of appellant refused to permit him to do so. Grigson went to his car, but appellant took the key out of the car and would not permit Grigson to leave in it. Grigson then went to a filling station a block away from the store and attempted to call the police headquarters, but got no response. Grigson then called the sheriff's office and requested the sheriff to come to the filling station where he then was. In a short time Lish Barber, the sheriff of the county, and Bob Smith, his

deputy, drove up to the filling station in separate cars. Grigson told the officers about the difficulty he had had with appellant, whereupon the sheriff, his deputy and Grigson drove to the store. It was admitted that appellant and his sons knew that Grigson had gone to call the officers. When the party reached the store they walked in, Grigson leading, the sheriff next, and Smith behind, and, as they came into the store, Wallace Adams, a son of appellant, remarked, "Daddy, there is Lish Barber," and appellant replied, "Damn Lish Barber—nobody is going to arrest me."

The State's testimony is to the effect that Allen Adams, a younger son of appellant, was also in the store when the officers came in, and that Adams and his sons placed themselves as follows: Wallace Adams was behind a counter, near the front door, armed with his father's pistol; Allen Adams, the younger son, was in another corner of the store, armed with the Winchester rifle; and appellant was near the center of the store, behind a small counter, armed with a knife. Ruth Shumaker, a young lady whose home was near appellant's store, testified that she saw Barber get out of his car, and that he spoke to her, and smiled.

Barber walked near the center of the store, and, in a friendly way, said, "Hello, Hendricks." The testimony is sharply conflicting as to what then occurred, and the State's version was not developed until after the appellant had put on his testimony, and one of the errors assigned is the order in which the State was permitted to develop its case. We state this testimony at this time to preserve the proper chronology. According to appellant and his sons, who testified in their father's behalf, Barber's first remark was to inquire, "What is the matter with you and the big Irishman?" meaning Grigson. Appellant answered, "The big son-of-a bitch was trying to run me out of my business, and nobody can do that." Appellant testified that, when he said this, Grigson jumped back and began to curse, and, as appellant turned towards Grigson, Barber shot appel-

lant, the ball going through appellant's arm, penetrating his body and lodging in his lung. Appellant further testified that, as soon as Barber shot him, Wallace Adams seized Barber's pistol, and a scuffle for its possession ensued, and that Barber struck Wallace over the head with the pistol. Appellant then took the rifle from the hands of his younger son, Allen, and, as he did so, Barber threw Wallace from him and started towards appellant with his pistol drawn on him, whereupon appellant shot Barber with the rifle. Barber then turned and ran through the screen door, and this was the last appellant saw of Barber.

Grigson, who was called in rebuttal, and whose testimony was objected to upon the ground that his testimony was not rebuttal, stated that, when Barber entered the store, Adams came from behind the counter with the knife in his hand, and advanced on Barber, who slowly retreated, pushing appellant back, and telling appellant to drop his knife, but appellant advanced, and struck at Barber with his knife, cutting Barber's hand and left wrist to the bone, and, when Barber drew his pistol, Allen Adams and Barber both fired, and Wallace Adams shot Smith, inflicting a slight flesh wound. All three shots were fired so near together that you could not tell who fired first. Grigson fell down behind the counter and went out the back door. The shot fired by Allen Adams knocked Grigson's hat off his head. Appellant denied cutting Barber, and denied that Barber was cut, but several witnesses, including the undertaker who prepared Barber's body for burial, testified to the existence of the knife wounds.

Grigson testified that Smith and Barber left the store, and appellant followed them, and, while Barber, who had got into the street, was backing away, appellant shot Barber just above the heart, and Barber died in a few minutes. Just as this fatal shot was fired, Smith, who was about two-thirds across the street, fired two or three shots at appellant as appellant was advancing on Barber. Smith then passed behind an automobile parked

on the side of the street, and from there he went along the walk to the house of a man named Whitney, through whose yard he walked, coming out at the rear of Whitney's lot. Smith then went to the store of J. H. Scott, and appellant saw Smith enter the store. Appellant admitted that, after shooting Barber, he went back into the store, but, in a short time, he came out again and started for Scott's store with the rifle under his arm. Some boys who saw appellant coming remarked, "Yonder he comes, and he will kill all of us." Smith and Scott heard this remark, and they came to the door of Scott's store, and Smith cried out to appellant, "Henry, I give up, I throw my gun away," and as he said this he drew his pistol from his holster and pitched it in the street six or eight feet beyond the sidewalk. Appellant called Smith a vile name and said, "Yes, give your soul to God," and shot Smith. Appellant denied hearing the remark Smith made about giving up, but two witnesses who were further from Smith than appellant was, testified that they heard the remark. Smith ran out of the store, and, as he was passing out the rear door, appellant again shot Smith, who died the following day. Scott remonstrated with appellant, who said, "I'll kill every damn one of them."

It was appellant's theory that Barber was the aggressor in the first shooting, and that, when Barber shot him, he became so greatly enraged that no cooling time intervened before he killed Smith, the man he was tried for killing.

We are of the opinion that the testimony recited fully justified the court in submitting to the jury the question whether appellant was guilty of murder as charged, and that the testimony is legally sufficient to support the verdict returned.

The court gave an elaborate charge on both degrees of murder, and, at appellant's request, gave the following charge on the subject of manslaughter:

"A. You are instructed that manslaughter is the unlawful killing of a human being without malice, either

expressed or implied; that manslaughter must be voluntary, upon a sudden heat of passion irresistible; and if you believe from the evidence that Barber assaulted deceased, Smith, was present aiding or assisting Barber in such assault, or was present for the purpose of aiding or assisting Barber in such assault, and that, while in this condition, and before a sufficient time had elapsed for his passion to cool, he armed himself, pursued unlawfully, and, without justification, killed the deceased, he would not be guilty of either degree of murder, but would be guilty of manslaughter only.''

Appellant requested an instruction numbered 6-A, which the court gave as modified, and appellant excepted to the modification. This instruction as amended reads as follows: ''You are further instructed that, if you find the defendant was assaulted by the sheriff and his deputy, or either of them, with a murderous intent, the defendant was not bound to retreat, but might stand his ground against the one thus assaulting him and kill his assailant, if he honestly believed, without fault or carelessness, that it was necessary to prevent his assailant from taking his life or doing him great bodily harm.''

Appellant requested instructions numbered 7-B, 8 and 8-A. 7-B reads as follows: ''You are instructed that, if you find from the evidence that the sheriff and or his deputy did not go into the store for the purpose of arresting the defendant for a felony, then you are instructed that the sheriff and or his deputy had no other or better rights in said store at the time than any private individual.'' The court refused to give this instruction, and appellant excepted.

Instruction numbered 8 reads as follows: ''You are instructed that the sheriff and his deputy had no right, under the law, to attempt to arrest the defendant for any disturbance or row the defendant may have had with Grigson prior to the time of the arrival of the sheriff or his deputy at the store where the shooting occurred, unless you find they had a warrant for him, and, if they or either of them attempted so to do without a warrant,

then you are instructed that, in such attempt, they were acting in violation of the law, and in violation of the rights of the defendant." This instruction was also refused, and appellant excepted.

Instruction numbered 8-A as requested reads as follows: "You are instructed that, if the defendant, at the time of the shooting, when the sheriff and his deputy came into the house, was not disturbing the peace, or was not attempting to commit a misdemeanor, or an assault of any kind upon any party, neither the sheriff nor his deputy had any right whatsoever to arrest him or to attempt to do him any bodily injury, and if they or either of them, under such circumstances, did shoot at the defendant, then you are instructed that the party so shooting, whether the sheriff or his deputy, or both, was himself violating the law and was the aggressor in the fight, if you find a fight occurred." The court refused to give instruction 8-A as requested, but modified it to read as follows: "You are instructed that, if the defendant, at the time the shooting began in Grigson & Adams' store, was not disturbing the peace, or was not attempting to commit a misdemeanor, or an assault of any kind upon any party, neither the sheriff nor his deputy had any right whatsoever to arrest him or to attempt to do him any bodily injury, and if they or either of them, under such circumstances, did shoot at the defendant, then you are instructed that the party so shooting was himself violating the law." Appellant objected to the modification and to giving instruction 8-A as modified, and it was not given.

It is the opinion of the majority—in which Justices WOOD and HUMPHREYS and the writer do not concur—that instructions 7-B and 8 should have been given, and that the refusal to give these instructions, and especially instruction numbered 8, was prejudicial to appellant, inasmuch as no instruction was given which declared the law to be that, if the sheriff and his deputy were not acting in the capacity of officers of the law, with the right so to act, no account should be taken of the fact that they

were officers. In other words, the fact that Barber and Smith were officers of the law was not a circumstance to be considered by the jury, unless the officers had the right to act in that capacity and were so acting, and an instruction should have been given so advising the jury.

Justices WOOD and HUMPHREYS and the writer think that the case was properly submitted to the jury, and that there was no error in the record. As appears from the facts herein recited, the State insisted, and offered testimony tending to show, that appellant was the aggressor throughout. The testimony on the part of the appellant was to the effect that Barber was the aggressor, and shot appellant without provocation, and thereafter appellant was so enraged at Smith, who was present for the purpose of aiding Barber in such assault, that, without having time for his passion to cool, he killed Smith. The instructions declared the law applicable to these issues of fact, and the instructions given made no diminution of appellant's right to defend himself because his assailants were officers, but the instructions fully declared the law to be that Barber and Smith had no right to assault appellant and that appellant had the right to resist any assault upon him by them, or either of them, and the fact that Barber and Smith were officers could have given appellant no greater right than this.

We do not reverse the case because of the time when the testimony of Grigson was introduced. We have many times said that the trial court has a wide discretion in determining the order in which testimony may be introduced, and that we will not reverse on that account unless an abuse of this discretion is shown, and we think no prejudice was shown here. But, inasmuch as the case is to be reversed and remanded for a new trial, we take occasion to say that the testimony of Grigson should properly have been offered as a part of the State's case in chief, and not as rebuttal testimony. It was proper and essential for the State to prove circumstances from which malice and deliberation might be inferred, if a conviction of murder in the first degree was asked, and, as

this was the purpose of Grigson's testimony, it should therefore properly have been offered as a part of the main case, and not in rebuttal.

Numerous other assignments of error are discussed, but no error is found except in the refusal to give instructions 7-B and 8 set out above, and, for the refusal to give these instructions, the judgment will be reversed, and the cause remanded for a new trial.