WALKER *v.* STATE.

4903                                       317 S. W. 2d 823

Opinion delivered November 24, 1958.

*Skillman & Fitzhugh,* for appellant.

*Bruce Bennett,* Atty. Gen. and *Thorp Thomas,* for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Thomas Walker, was charged by Information with the crime of First Degree Murder. The case went to trial and the jury returned a verdict of guilty, fixing Walker's punishment at death in the electric chair. The cause is here on appeal. Appellant contends that the evidence was insufficient to sustain the conviction, and that a verdict of acquittal should have been directed by the court.

On March 9, 1957, around 9:30 p. m., a Saturday night, J. W. Orman, while on duty at the Cates Esso Station in West Memphis, was killed by a shotgun blast, fired by a Negro man, during an attempted holdup. Mr. and Mrs. Marvin Smith witnessed the slaying. Mr. Smith was inside the station, using the telephone, and his wife was sitting in the car in front of the station. Both heard the intruder say, "Stick them up," and Mr. Smith testified that the murderer had a double barrelled shotgun. The man was wearing an old felt hat, pulled down over his face. They stated that the murderer was a Negro, but were unable to identify appellant as the per-

petrator of the crime. Following the report of the killing to officials, Arkansas State Trooper Bobby Sanders, with two other officers, went to the station, obtained a description of the suspect, and then drove south on Hulbert Road. After obtaining information from a young colored boy named Peals, who had observed a man running across a field, next hiding in a ditch when a car passed, and then running straight down the highway toward Hulbert, the officers drove on to Hulbert, and State Trooper Weaver walked down the railroad tracks toward Memphis. The officers heard a car start on a dead-end road at the edge of Hulbert, and watched it proceed to the Hulbert Road and turn south. Sanders testified that, judging from the sound of the starter, they considered the car to be an old model Buick or Pontiac, with a defective muffler, and observed that the left tail light was dimmer than the right. The next day, upon locating the car driven by appellant, it was found that such car was an old model Buick, with a defective muffler, and that the left tail light was dimmer than the right. Leroy Brown, a farm employee, employed by L. L. Riggan, testified that as he was leaving the Riggan barn, located at the intersection of Fletcher Lake Road and Dixon-Yates Road, around 12:30 or 1:00 a. m., on Sunday morning following the shooting, a man carrying a gas siphoning hose and a shotgun, caught up with him. They engaged in small talk, and parted at the intersection of Rock Road and Fletcher Lake Road. Brown testified that appellant "looks pretty well" like the man he saw on the road, but would not positively identify him. John Tolbert Clemons, also an employee of Riggan, testified that about sunup, he got up to hook up a pair of mules, and observed an "old model, sort of blue looking, might have been green, I took it to be blue, old model car setting side the road." From the testimony: "Q. Was anybody by the car? A. Looked like a gentleman off from the car, sorta stooped over, off from the car. Q. Which way was the car headed? A. The way the road run, south like. Q. Away from you? A. Yes, sir. Away from me. Q. How did you say the gentleman was? A. Looked like he was sorta bent

over, away from the car, sorta stooped over.'' He testified that later, a colored man, driving the blue car, passed the barn and stopped at the home of William Bradford, another employee of Riggan. According to his testimony, the driver of the car walked back up toward the barn, and talked with Richie Taylor, another employee, about finding work. Clemons identified Walker as the stranger seeking work. Bradford testified that appellant stopped at his house and asked if he (Bradford) could let him have any gas or money. Walker then inquired about getting work, and was told that he would have to see "my boss man." He further testified that Walker parked his car where it could not be seen by people coming down the Hulbert Road. L. L. Riggan testified that Walker asked him for work. When told that none was available, appellant went across the field to the home of James Williams, likewise a tenant on the Riggan farm. Riggan, who had heard about the killing earlier that morning, drove to West Memphis, and notified officers of Walker's presence on his farm. In the meantime, according to witness Williams, Walker came to his home and asked Williams to fix him something to eat. Before the latter could finish preparing the meal, the officers arrived and took Walker into custody.

In another phase of the investigation, Lieutenant Charles Duncan of the West Memphis Police department, testified that he searched the immediate vicinity around the station for clues, and found footprints[1] leading into a field just west of the West Memphis road and the service station. The footprints led to an open field that borders Hulbert Road and went as far as Bowen Airfield (where Peals saw the man running). The tracks were followed to the Hulbert Road. About five hundred yards from the point where the tracks started, Duncan found an empty 12-gauge shotgun shell. This

[1] Only one set of prints was found. According to the testimony, the field was wet and soggy.

testimony was corroborated by Captain Romines of the West Memphis Police Department.[2]

After taking Walker into custody at the home of Williams, appellant was transported to the City Hall in West Memphis by two of the officers, while the others stayed and searched for the shotgun. It was finally located, buried at the side of the road, lying in one of the gulleys, being covered lightly with dirt, and a burned piece of fence post, and near the place where Tolbert had noticed the parked blue car, and the man bending over. A search of the automobile revealed a piece of hose and a gas can in the back of the car. A shotgun shell was taken from appellant's possession[3] at the City Hall. As reflected by the evidence, Captain Romines and Lieutenant Duncan talked to appellant at the West Memphis City Hall around 10 o'clock on the morning of the arrest. His oral statement to them was to the following effect. After stating that his name was Thomas Morris, he changed it to Walker, and stated that he lived in Blytheville . . . had been in West Memphis a couple of days, after getting lost . . . he got lost between Osceola and Blytheville, taking a wrong turn . . . that the automobile he was driving, and the shotgun,[4] belonged to Lilly Daniels,[5] with whom he was living in Blytheville . . . he identified the shotgun as the one he brought from Blytheville . . . around 9 o'clock Saturday night, he was on a street where there were a lot of Negroes, and negro ''honky tonks'' . . . he overheard one say there had been a killing . . . that somebody had been shot with a shotgun . . .

---

[2] The officers made casts of the prints, which were approximately the same size and general appearance of Walker's shoes; however, according to Captain Romines: "We didn't think the casts were good enough, due to the condition of the ground, to definitely or positively identify the tracks as having been made by any particular shoe." Captain Romines also testified that some of the prints by the road were measured, and that the first print, from the heel to the next heel, was 6½ feet, and the next 5½ feet, indicating that whoever made the prints was traveling fast.

[3] This shotgun shell, like the expended one, was a blue, Peters 12-gauge shell.

[4] A double barrelled shotgun with wire wrapped around the handle.

[5] The car was turned over to Lilly Daniels four days later when it was ascertained that it belonged to her.

he got scared, because he had the shotgun in the car, left, and drove away (to the area which constituted a part of the Riggan plantation) . . . that during the night he stayed around the car, walking up and down the turn row to keep warm . . . the next morning, he buried the double barrelled shotgun beside the road in the ditch, because he didn't want to get caught with it . . . that after burying the shotgun, he went to a colored boy's house on the plantation, parked his car, went down and asked a white man for a job . . . that he then went to another colored boy's house to try and get breakfast (the home of Williams, where he was arrested).

The shotgun, expended shell, and loaded shell, all properly identified by the officers, were sent by Captain Romines to the Federal Bureau of Investigation at Washington, with a request for a laboratory examination to determine if the expended shell had been fired from that particular shotgun, and if there was any relation between the expended shell and the loaded shell. Marion E. Williams,[6] ballistics expert, and an employee of the Bureau for 19 years, conducted the examination of the gun and shells, and testified as follows: As to die markings, of the loaded shell and the expended shell, Williams testified that they were stamped from the same machine, though that did not necessarily mean that they came from the same box. According to his testimony, many thousands of shells are stamped with the same

---

[6] Qualifications are as follows: "I have a Bachelor of Science degree, which I received prior to going to work for the Federal Bureau of Investigation. Since my employment there, I have studied under instructors who have made their life work firearms and ammunitions, too, that type. And, in different firearms and ammunitions plants, studying the method of manufacture and studying ammunitions, things of that type. I read various books and periodicals on the subject of guns, examinations. Made many examinations on my own in the Federal Bureau of Investigation laboratory. And have made examinations in several hundred cases and presented the evidence in courts in several jurisdictions throughout the United States. * * * Q. Would you tell the jury what your teaching experience is? A. Well, since being assigned to the Federal Bureau of Investigation laboratory, I have participated in numerous schools, both in Washington and throughout the United States, designed to train police officers and other men in this profession in the handling of evidence, particularly as it relates to firearms, ammunition, things of that type."

marking, ''Since there are 25 in a box, this same marking might appear in any number boxes of shells. * * * Q. Could have come from the same box, but that is not necessarily true? A. Could have, yes.'' Williams testified that two test rounds of ammunition were fired through each barrel of the shotgun sent to him, and he then went into minute and interesting detail as to the manner in which it is determined whether a particular shell was fired from a particular gun. This explanation was implemented by enlarged photographs, showing the markings on the head of the shell, caused by the breech face of the gun.[7] He testified that the expended shell sent to him (which had been found in the field) was fired in the right barrel of the shotgun, and stated that this conclusion was reached from many points of comparison. Although vigorously cross examined, Williams was quite emphatic and positive in this statement. His testimony was impressive and authoritatively related, and was, we think, potent testimony.

Appellant points out that the evidence is circumstantial. Yet, circumstantial evidence has long been recognized by the law as sufficient to sustain a conviction. *Osburne* v. *State,* 181 Ark. 661, 27 S. W. 2d 783, *Jeffer-*

---

[7] "This photograph is a photograph made through a comparison microscope. It is, I will explain that, a comparison microscope is actually an arrangement whereby two microscopes are put side by side, or two microscopes. Then we place on the left hand stage, ordinarily place the evidence shell, which in this case is Plaintiff Exhibit No. 9. On the righthand stage, place the specimen which was fired in the laboratory, they are situated side by side on the stages of the microscope. By optical means the images of the two primers are brought together in one single eyepiece in the instrument. As you look through the eyepiece, you see a portion of Plaintiff Exhibit No. 9, which is the evidence shell, and a portion of the test shell, through the microscope. It is possible by a mechanical arrangement of the microscope to move the shell to the right, left, up, down. It is possible, under the microscope, when arranged in the comparison microscope, you see through the microscope as a split field. This line in the center is caused by the split in the field. As you look at the photograph for this set-up, the left side of this photograph or the left as you see it, is a portion of the head of the shot shell in the area adjacent to the firing pin impression on the primer, enlarged 50 or 60 times. That area, portion on the right, my right, your left, is a portion of the head of the shot shell which was fired in the laboratory in the right barrel of the shotgun. These markings that seem to pass across the line from the head of one shell to the other are points used for the purpose of identification. Those markings are caused by the breech face of the gun."

*son* v. *State,* 196 Ark. 897, 120 S. W. 2d 327, *Smith* v. *State,* 227 Ark. 332, 299 S. W. 2d 52. While parts of the testimony failed to link appellant with the crime, because of the inability of witnesses to make identification (testimony of the Smiths and Peal), and some other testimony, standing alone, was of but little value, it was certainly established that appellant was near the area in which the murder was committed . . . he was without money and apparently in need of funds (testimony of William Bradford), which could have been his motive for attempting robbery . . . Orman's slayer used a double barrelled shotgun . . . Walker had such a weapon in his possession at the time . . . he went out into the country and spent the night walking back and forth on a turn row, which was unusual, since he had been in town for two days . . . he went to the trouble of burying the shotgun . . . a siphoning hose was found in the car he was using (which ties in with the testimony of Leroy Brown), . . . the shotgun shell in his pocket was of the same brand, gauge, and color as the expended shell — and the expended shell, found not too far from the scene of the shooting, had been fired from the gun in Walker's possession. In the *Osburne* case, *supra,* Justice SMITH, speaking for the Court, said:

"But it may be doubted whether the State relied upon circumstantial evidence alone in the instant case. It is true that no witness who testified in the case saw the killing, but numerous statements of appellant herself relating thereto were offered in evidence, and the inferences deducible therefrom were of an incriminating character. The inference is fair and reasonable from appellant's own admissions that she must have known how her husband met his death, and her improbable and untrue statements in regard thereto support the conclusion that she was a party to his murder."

No evidence was here offered on behalf of appellant, and the testimony of the officers as to the oral statements made by Walker to them, stands uncontradicted and unexplained. This testimony constitutes persuasive

evidence in support of the conviction. Even if we consider appellant as an ignorant neer-do-well, obsessed by fear, still his actions are totally inconsistent with innocence; his story too unlikely for credence.

The court did not err in refusing to direct a verdict of acquittal, and the evidence, under numerous holdings of this Court, was sufficient to sustain the verdict rendered. We have examined the record, and find no reversible error.

Affirmed.

WILLIAM J. SMITH, J., not participating.