JIMMY DON COOK *v.* STATE OF ARKANSAS

5466                                            451 S. W. 2d 473

Opinion delivered March 23, 1970

*Hardin, Barton, Jesson & Dawson,* for appellant.

*Joe Purcell,* Attorney General; *Don Langston* and *Mike Wilson,* Asst. Attys. Gen., for appellee.

J. Fred Jones, Justice. Jimmy Don Cook was tried before a jury and convicted of voluntary manslaughter in the Sebastian County Circuit Court. He was sentenced to serve not less than two years nor more than six years in the Arkansas Penitentiary. He has appealed to this court and has designated the points he relies on for reversal, as follows:

"The evidence is circumstantial in nature and wholly insufficient to support the jury verdict.

The court erred in refusing to instruct the jury on involuntary manslaughter."

We do not agree with the appellant on either of the points he has designated.

The facts in this case are derived from circumstantial evidence surrounding a typical barroom brawl, where no one sees anyone do anything unlawful, but where a man lies dead in his own blood, from a stab wound in the heart, when the shouting has died down and the pushing has stopped. Such was the situation at the Brass Rail Bar in Fort Smith at midnight on April 25, 1969, when Donald Mizell died as a result of a stab wound in the heart. Donald's father owned the Brass Rail.

On the night in question Nita Pard Lanier was the only bartender, or waitress, at the Brass Rail. She testified that there was a good crowd of customers in the place, and that for one person, it was about all she could handle. Mrs. Lanier testified that she was acquainted with the appellant and that on the night in question she saw him alight from a taxicab in front of the Brass Rail and start into the place. She says that she met the appellant at the door, and on this point she testified as follows:

". . . I told him, 'Jimmy, you can't come in here, you know you're barred,' and he said, 'Yes, Nita, I know it, but I was just looking for someone.' "

Mrs. Lanier testified that this conversation occurred approximately four seats[1] inside the building. She says that she then went to the last booth in the back of the building and delivered two cokes and two beers and when she returned to the front of the building, the appellant was standing with his back to the wall and a blonde headed girl was standing in front of him with her arms outstretched in the attitude of preventing the appellant from leaving. She says that the girl called twice to Leon Greenhall, "Leon, go call daddy." Mrs. Lanier then testified:

> "I told her, I says, 'There isn't any use in anyone calling anyone, Jimmy's leaving.' So at that time Leon turned and walked away and the girl stepped aside and Jimmy walked to the front door with me and then after he got outside well Jimmy turned around and called me a dirty name and told me to come outside and he would show me what he would do to me."

This witness testified that as the appellant was proceeding from the front door to the sidewalk, and while she was still standing in the front door, several people shoved past her from inside the building, and more or less carried her along with them, in following the appellant outside to the sidewalk. She says that she saw a man, whom she did not know, knock the appellant to the sidewalk. She testified that she rushed back inside the building and as she entered the door, she looked back and saw the appellant propped up on one elbow in the process of arising from the sidewalk, and that he had a dark or black object, four or five inches long, in his right hand. Mrs. Lanier says that she then called the police by phone and that while she was calling the police, one of the customers "hollered and said, 'Nita, call an ambulance, this man's bleeding to death.' "

---

[1] At another place Mrs. Lanier says she first talked to the appellant four or five *feet* inside the building. There are fourteen seats, or stools, evenly spaced along the length of the bar in the Brass Rail, and Mizell was found slumped to the floor between the fifth and sixth seat from the front of the building.

She says that after using the phone she went around the bar to where Donald Mizell was. At this point she testified as follows:

"Q. And where was he after you first saw him after he had been stabbed?

A. After the stabbing, he was between two stools middle ways of the bar.

Q. Did you see him come back into the bar?

A. No, sir.

Q. Do you know what relationship there is, if any, to Mr. Mizell to the owners and operators of the bar?

A. Yes, sir.

Q. Will you please tell the jury what that relationship is?

A. Don Mizell is Harley Mizell's son.

Q. The deceased is the son of the operator and owner of the bar?

A. Yes, sir."

Mrs. Lanier testified that she was not well acquainted with the deceased and does not recall seeing him come into the bar.

"Q. How long had the Mizell boy been in the place on that evening? Do you have any judgment about it?

A. I'd say approximately maybe ten minutes, I hadn't waited on him, I didn't even see him come in and he came to the stool and I served him.

Q. Now that was up at the bar?

A. Yes, sir.

Q. You say you did not see him come in?

A. No, sir."

Officer Joe Thomas testified that he is a patrolman for the city of Fort Smith and was so employed on the night in question. He says that around 12:00 a.m. on the night in question, while on normal patrol past the Brass Rail, he noticed several people in front of the tavern and about that time he saw someone get knocked, or shoved, down to the sidewalk. He says that this individual got up and seemed to lunge at the crowd of seven or eight people. He says that he called the police station and requested that additional officers be dispatched to the scene. He says that as he parked his own vehicle, and started toward the crowd on the sidewalk, the crowd quickly dissolved and everyone started back inside the Brass Rail. He says that while he was questioning a couple of boys who were passing in front of the Brass Rail, a lady who worked in the place, came out and told him that a boy inside had been stabbed and asked him to send an ambulance. This witness testified that when his captain arrived they called an ambulance. As to the location and condition of Mizell, this witness testified:

"Q. Where was he when you first saw him?

A. He was on the inside of the Brass Rail laying hunkered down between two stools, leaning up against the bar.

Q. Were you there at the time he was removed?

A. Yes, sir.

Q. What was his condition at the time he was removed?

A.  He was unconscious at the time that we put him in the ambulance, I don't believe that he was moving any whatsoever when we placed him on the stretcher and put him in the ambulance.

Q.  Did you have occasion to examine the spot where he was after he had been removed?

A.  Yes, sir."

Officer Roy Piercy testified that he was on routine police patrol for the city of Fort Smith on the night in question and received a call from one of the other units that there had been a disturbance at the Brass Rail. He says that he went to the Brass Rail where he found a rather large group of people on the sidewalk and it appeared that there had been a fight or something. He says that he went inside the building and there was a man, identified as Mr. Mizell, lying on the floor. He says that he stood by Mr. Mizell until the ambulance arrived and then went back to his regular patrol. He says that he was called a few minutes later and requested to go to the Edward's Funeral Home to witness an autopsy on Mizell. Officer Piercy testified that after he witnessed the autopsy and returned to his patrol, about 2:00 a.m. he was patrolling west on North B Street when he noticed an individual across the street in the 600 block near a vacant service station. He says that he stopped the individual and upon questioning him learned that he was the appellant, Jimmy Don Cook. He says that the appellant had been drinking some and was rather belligerent. He says that when he "frisked" the appellant, he found a knife in his belt; that he took the knife from him and placed him under arrest for investigation of murder. This witness identified the appellant as the individual he arrested and testified that the appellant was carrying the knife under his belt with the blade down on the appellant's lefthand side. He is not sure whether the knife was outside the appellant's shirt or under the shirt.

Dr. Annette Landrum, a practicing pathologist in Fort Smith, testified that she performed an autopsy on the body of Mizell at approximately 1:20 a.m. on April 26 at the Edward's Funeral Home. She testified that the autopsy revealed a stab wound which had entered the chest and which had penetrated the right ventricle of the heart, and that it was this penetrating stab wound of the heart that had caused the death. She testified that the stab wound penetrated through the cartilages of the 7th and 8th ribs anteriorly, that is, crossing through the cartilages and severing them and then passing through the pericardial cavity and through the heart but not penetrating the back of the pericardial cavity or the sacs surrounding the heart. This witness testified that the length of the wound was approximately one to one and one-half inches end to end and the depth of the wound was approximately three and one-half inches. Dr. Landrum testified that from the size, shape and depth of the wound, and from the size and shape of the appellant's knife placed in evidence, one could logically conclude that the wound could have been made with the appellant's knife.

Dr. Rodney F. Carlton, associate state medical examiner and a specialist in forensic pathology, testified that he received a vial of blood labeled "Donald Mizell" and a western black-handled knife. He says that he analyzed some stains found on the knife blade and found that it was human blood, probably of group "A." He says that he examined the vial of blood and found it to be blood group "O." This witness testified as to the procedure he used in typing the blood and testified that he concluded that the stain found on the knife was probably group "A," knowing full well that he could not exclude group "O" being present or the possibility that a contamination of the stain on the knife blade had occurred. Dr. Carlton testified that he labeled the blood on the knife as probable group "A"; that he is real sure group "A" blood was present on the knife, but that under the test that he ran, he was unable to exclude group "O" blood from being present on the knife.

Our past decisions are of little value in determining the sufficiency of circumstantial evidence to sustain a conviction by jury verdict, for the reason that each case of conviction must stand on the substantiality of its own evidence, and circumstantial evidence is no stronger than the circumstances from which the facts are sifted and the ties that bind the facts together.

Circumstantial evidence has long been recognized by law as sufficient to sustain a conviction. *Walker* v. *State,* 229 Ark. 685, 317 S. W. 2d 823; *Osburne* v. *State,* 181 Ark. 661, 27 S. W. 2d 783; *Jefferson* v. *State,* 196 Ark. 897, 120 S. W. 2d 327; *Smith* v. *State,* 227 Ark. 332, 299 S. W. 2d 52.

The law is also well settled that in testing the sufficiency of evidence on appeal to sustain a jury verdict of guilty in a criminal case, the evidence must be viewed in the light most favorable to the state. *Scott* v. *State,* 180 Ark. 408, 21 S. W. 2d 186; *Campbell* v. *State,* 170 Ark. 936, 282 S. W. 4. In *Scott,* supra, this court said:

"The defendant was convicted on circumstantial evidence, but there is no difference in the effect between circumstantial evidence and direct evidence. In either case it is a question for the jury to determine, and, if the jury believes from the circumstances introduced in evidence, beyond a reasonable doubt, that the defendant is guilty, it is the duty of the jury to find him guilty just as it would be if the evidence was direct. There is no greater degree of certainty in proof required where the evidence is circumstantial than where it is direct, for in either case the jury must be convinced of the guilt of the defendant beyong a reasonable doubt. They are bound by their oaths to render a verdict upon all the evidence, and the law makes no distinction between direct evidence of a fact and evidence of circumstances from which the existance of the fact may be inferred. *Nichols' Applied Evidence,* vol. 2,

§ 4, 1065; *Underhill's Criminal Evidence, pages 14 and 16.*"

In *Dowell* v. *State,* 191 Ark. 311, 86 S. W. 2d 23, the appellant was convicted of first degree murder based on circumstantial evidence. In affirming that conviction this court said:

"'The law is well settled in this State that a jury's verdict which rests solely upon speculation and conjecture will not be permitted to stand. *Jones* v. *State,* 85 Ark. 360, 108 S. W. 223; *Martin* v. *State,* 151 Ark. 365, 236 S. W. 274; *Adams* v. *State,* 173 Ark. 713, 193 S. W. 19; *Hogan* v. *State,* 170 Ark. 1143, 282 S. W. 984. On the other hand, this court. in testing the sufficiency of the testimony to support a jury's verdict, views such testimony in the light most favorable to the state. *Morgan* v. *State,* 189 Ark. 981; *Rhea* v. *State,* 104 Ark. 162, 147 S. W. 463. Moreover, circumstantial testimony is legal and proper, and, when properly connected, furnishes a substantial basis and support for a jury's verdict. *State* v. *Jennings,* 10 Ark. 428; *Scott* v. *State,* 180 Ark. 408, 21 S. W. 2d 186; *Taylor* v. *State,* 178 Ark. 1200, 10 S. W. 2d 853."

Manslaughter is a degree of homicide defined under Arkansas law (Ark. Stat. Ann. § 41-2207 [Repl. 1964]) as "the unlawful killing of a human being, without malice express or implied, and without deliberation." Section 41-2208 defines *voluntary* manslaughter in the following language:

"Manslaughter must be voluntary, upon a sudden heat of passion caused by a provocation, apparently sufficient to make the passion irresistible."

In § 41-2209, *involuntary* manslaughter is defined as follows:

"If the killing be in the commission of an unlawful act, without malice, and without the means

calculated to produce death, or in the prosecution of a lawful act, done without due caution and circumspection, it shall be manslaughter. Provided further . . .''

As to the sufficiency of the evidence to sustain the jury verdict in this case, the question actually amounts to little more than whether there was any substantial evidence from which the jury was justified in concluding that the appellant stabbed Mizell. We conclude that there was. The record is clear that the appellant was not a welcome customer at the Brass Rail. When he was reminded of this fact, he agreed that he had been "barred," but he went to the Brass Rail anyway "looking for someone." Young Mizell's father owned and operated the Brass Rail from which the appellant had been barred. Young Mizell was larger than the appellant and he was found slumped to the floor, with a stab wound in the chest, only a few feet at most from where the appellant was detained by a "blonde headed girl" who had called out twice, "Leon, go call daddy." The jury might well have interpreted this action on the part of the "blonde headed girl" as an effort to keep appellant separated from those he would harm, or from those who would harm him. In any event, the appellant walked with Mrs. Lanier some undisclosed distance from inside the building to the door, and as described by Mrs. Lanier, "just like he was in a daze." Mrs. Lanier was the only witness who testified as to what went on inside the Brass Rail, and there is no evidence as to what happened while she delivered beer and cokes to the back booth during the interval between the time appellant said he was looking for someone and the blonde headed girl said, "go call daddy." As the appellant was leaving the building, for some reason not shown in the record, several customers from the Brass Rail crowded through the door following the appellant to the sidewalk, and carrying Mrs. Lanier along with them "like a bulldozer." Mrs. Lanier saw someone *she did not know* knock the appellant down and as the appellant started to arise from the sidewalk, he had a black

object four or five inches long in his right hand.[2]

A police officer saw the appellant fall to the sidewalk amidst a crowd in front of the Brass Rail and saw the appellant arise from the sidewalk and "lunge at the crowd." Officer Thomas saw the members of the crowd go back into the building as he approached them. The appellant was apprehended about two hours after he left the Brass Rail and he had the hunting knife, offered in evidence, stuck under his belt on his left side and the knife had dried human blood on it. The victim's blood was type "O" and the bloodstain on the knife was found to be probably type "A" under the procedure used. Type "O" blood can give an "A" type reaction when contaminated with perspiration from a person with "A" type. The test used by the pathologist was very sensitive to "A" type reaction, and "O" type blood could not be ruled out by the tests made.

The evidence before the jury can be summarized as follows: When arrested, the appellant was carrying a knife with bloodstains on it. He had recently come from a tavern from which he had been barred, but to which he had gone "looking for someone." While the appellant was at the tavern Mizell was stabbed with an instrument commensurate in size and length with the appellant's knife blade. There is no evidence that anyone else carried such a knife as the appellant carried, and there was no evidence that the stab wound in Mizell's chest was, or could have been, inflicted with an instrument other than one the size and shape of the knife blade the appellant was carrying. We conclude that the evidence is sufficient to sustain the conviction.

As to the appellant's second point, we are of the

---

[2]The knife taken from the appellant was not well described in the testimony, except as a "black western type knife" by Dr. Carlton. The knife is before us as an exhibit. It is a hunting type knife designed to be carried in a scabbard on a belt. The blade is formed by a single piece of steel extending through the black handle. The handlegrip and blade are separated by the usual handguard seen on this type hunting knife.

opinion that the trial court was correct in refusing the appellant's requested instruction on involuntary manslaughter. The requested instruction is as follows:

> "Involuntary Manslaughter is defined in law as follows: If the killing be in the commission of an unlawful act, without malice, and without the means calculated to produce death, or in the prosecution of a lawful act done without due caution and circumspection, it shall be involuntary manslaughter.
>
> If you find from the evidence beyond a reasonable doubt that the defendant committed the offense of involuntary manslaughter you will find him guilty thereof. If you do not so find you should acquit him and return a verdict in this case of not guilty."

The requested instruction contains two paragraphs. The first paragraph defines "involuntary manslaughter," and the second paragraph, which actually constitutes the instruction, tells the jury to either find the appellant guilty of involuntary manslaughter or acquit him. The appellant was actually charged with, and tried for, second degree murder, but was convicted of voluntary manslaughter. Even if the appellant had been entitled to an instruction on involuntary manslaughter, he would not have been entitled to a directed verdict on all other degrees of homicide under the evidence of record in this case.

The judgment is affirmed.