504

CLOYS A. THOMAS *v.* STATE OF ARKANSAS

5562                 465 S. W. 2d 704

Opinion delivered April 19, 1971

*Tackett, Young, Patton & Harrelson,* for appellant.

*Ray Thornton,* Attorney General; *Mike Wilson,* Asst. Atty. Gen., for appellee.

J. FRED JONES, Justice. The appellant, Cloys A. Thomas, was convicted of second degree murder in the Howard County Circuit Court and was sentenced to ten years in the penitentiary. On his appeal to this court he relies on the following points for reversal:

"The verdict and judgment are contrary to the law.

The verdict and judgment are contrary to the evidence.

The verdict and judgment are contrary to the law and to the evidence.

The Court erred in refusing to sustain Defendant's motion at the conclusion of Plaintiff's testimony for a directed verdict."

Under Arkansas law, murder is the unlawful killing of a human being, in the peace of the state, with malice aforethought, either express or implied. Ark. Stat. Ann. § 41-2201 (Repl. 1964). All murder which is perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate, malicious and premeditated killing, or which is committed in the perpetration of or in the attempt to perpetrate, arson, rape, robbery, burglary or larceny, shall be deemed murder in the first degree. Ark. Stat. Ann. § 41-2205 (Repl. 1964). All other murder shall be deemed in the second degree. Ark. Stat. Ann. § 41-2206 (Repl. 1964).

The facts are not in dispute that about midnight on Friday, January 16, 1970, Billie June Thomas, the wife of the appellant, died from a .22 caliber rifle bullet fired at close range through her heart while in the bedroom of their trailer home. The appellant then carried his wife's body from the trailer; placed it in the trunk of his automobile; drove to a secluded area about two and one-half miles from their trailer home, and there he secreted the body under brush and leaves. On Saturday morning he went to visit a girl friend in Hooks, Texas, and on Sunday evening he returned to Nashville and reported to his brother, who lived about 150 yards from the appellant's trailer, that his wife was missing. On Monday following the death of his wife, the appellant told Eugene Ray about where he left his wife's body and he solicited the assistance of Eugene in going to the spot for the purpose of burying the body. He and Eugene went out to the area on Monday night but were unable to find the body. On Wednesday he went with Eugene to Hot Springs to deliver a truckload of tomatoes and on this trip he continued in his effort to convince Eugene that his wife was dead and that he had secreted her body. Either on Wednesday or Thursday night, he again went to the scene with a shovel, and this time he found his wife's body and buried it in a shallow grave. Eugene Ray refused to believe what the appellant had told him, but after learning that Mrs.

Thomas was missing, Ray told the officers what the appellant had related to him, and the officers soon found the body buried in the shallow grave.

The record is replete with testimony of threats made by the appellant to kill his wife, but on such occasions appellant would be either drunk or drinking and there is ample evidence that he became belligerent when under the influence of alcohol. The evidence is also clear that on the night of Mrs. Thomas' death, she and the appellant had both been drinking when they went to their trailer from his brother's home about 11:30 at night.

The appellant made a statement to the officers which was accepted in evidence and he also testified in his own defense. The theory of his defense was that his wife accidentally shot herself while moving a .22 rifle and a shotgun from a corner of the bedroom where he had left them, to a closet in the bedroom of the trailer. The appellant testified that he and his wife had many quarrels, as well as separations, during the ten years they were married to each other. He testified that on the Friday night of his wife's death, he and his wife visited in his brother's home until about 11:30 when they returned to their house trailer. He says that he had been bird hunting and had his shotgun in the car when he and his wife returned to the trailer from his brother's home; that after going into the trailer his wife went about putting some groceries up while he returned to his car, got his shotgun and put it in the corner of the bedroom where he usually kept his guns. He says he did not notice the .22 rifle that he usually kept in the corner but that it was probably there. He testified that after he put his gun and hunting shell vest in the corner, he turned on the TV and lay down on a couch in the living room to watch it. He says that in about three minutes he heard a muffled gunshot and a lot of racket. He says that he went into the master bedroom and that his wife was lying on the bed with one leg hanging off the bed, and that he saw her breathe one time. He says that both guns were laying on the bedroom floor with one or two coat hangers in between

the guns; that the clothes closet door was off the track and that there were some coat hangers hanging inside the bedroom closet door. He says that he checked his wife's pulse and felt for her heart beat. He says that he picked up the guns and placed them in the corner and,

"I thought I'd carry her to the hospital. Picked her up in this sheet that she was laying on, and I got down to the bottom of the steps and I got to thinking about all the trouble we'd had. I had been going with women, and she had been going out with these men. I got to thinking that people would think I was the cause of her death, had killed her, so I put her in the trunk of the car. I started driving this car, and I never could think where I was going to, but I went to this place where I used to hunt. I took her out of the car, put her in the leaves and went back home. I don't remember driving the car back home, but I know I did because it was setting out in the yard next morning. Next morning my dog woke me up scratching at the door. I let him in and he went into the bedroom, and this all come back to me. First I thought I'd had a bad dream. I couldn't find June and I got to looking around, and I found her shoes and her dress, and I knew it happened. I set down at this table and I got to thinking. I didn't know what to do, so I told this friend that lives at Hooks. I told her about it."

The appellant testified that in the past few years he had not cared anything about his wife and he didn't think she cared anything about him. He testified that when he checked his wife's pulse and found that she was dead,

"I first started to the hospital and I started down these steps and I got to thinking about all the trouble we had had, things that she had said about everything, and I had been going with this woman from Texas. She had been going with about every man she could go with. I got scared. * * * When I started down those steps I got scared. I got to thinking about all the trouble we'd had, the things

508

she had said, I got to thinking about the women I had went, with and the men she had went with, and I went berserk, and I put her in the trunk of the car.

\* \* \*

Q. . . . You say that you and June came into the trailer the last time, and you lay down on the couch?

A. Yes, sir.

Q. And that two or three minutes later your heard this noise?

A. Yes, sir. I turned on television before I laid down on the couch.

Q. Didn't you say she brought some groceries in with her?

A. Yes, sir.

Q. What did she do with those?

A. When I first opened the door, she had this steak, and I believe it was an apple pie, a frozen apple pie. I said, 'I've forgot my shotgun.' She went in the kitchen and put the groceries up, and I got my shotgun and put it in the corner. Then I turned on TV and laid down on the couch.

Q. And it must have been immediately then that you heard the shot.

A. Approximately two or three minutes.

Q. Possibly two or three minutes.

A. Approximately two or three minutes.

Q. And you relate that up to that second of time there had been nothing whatever unusual or out of the way happen?

A. She mumbled something in there. I had the TV on. Maybe she was trying to slide the door open or something. She mumbled something. I didn't understand what she said. She might have cussed or something."

In the statement that the appellant gave to the officers, the appellant stated, in part, as follows:

"A. We hadn't been in the trailer but just a few minutes 'till—I was in the living room and she was in the bedroom, and I heard the gun shoot, and I went in there and she was—fell back on the bed.

Q. Now, for the time being, I wish you would go ahead and tell in your own words, Tom, what happened then. Just relate what you did.

A. She was trying to put the guns in a closet, the way I thought, and the guns was laying there, and one coat hanger was laying out in the middle of the floor. She had a bunch of coat hangers she had brought back from Texarkana. And she didn't live a minute. By the time I got in there she breathed once or twice. So I started to call an ambulance, and I didn't want to run off and leave her. I got scared. I checked her pulse to see if she was still alive, and she didn't have no pulse.

Q. All right, then what?

A. I went out—I first started to call an ambulance and Lewis Tollett, and when I got scared I got to thinking maybe somebody would think I had shot her. We'd had so many arguments during her lifetime. So I got her and put her in the turtle hull. I didn't know

where I was going. I just took off driving, and I carried her to that place up there in them woods. I didn't have anything to bury her with, so I checked her again to see if she was still alive. She had got stiff.

Q. What did you do at that time to hide the body?

A. I don't think I hid her very good.

Q. Did you cover her with leaves?

A. I didn't have anything to cover her with but my hand.

Q. How was the body dressed at that time when you covered her with leaves there?

A. She might have been trying to take a bath. I don't know, or go to bed one. She had a brassiere and her britches on.

Q. When you say britches, you are referring to what a lot of people call panties?

A. Yes.

Q. All right. And then, Tom, what happened after you—What did you do after you left her there?

A. I burned that sheet. Or I might have burned it before, and I drove back to the house.

Q. Now, in talking about that sheet, I believe you told us that you had taken her from the house—

A. —in a sheet.

Q. In a sheet. Was this the sheet from the bed?

A. Yes.

Q. Was it the bottom sheet on the mattress on the bed, off the bed?

A. Yes.

Q. Was that the only sheet that you had out there with the body?

A. Yes.

Q. And you burned the sheet down at the gravel pit?

A. Yes.

Q. For the record, that's the gravel pit just on down a few yards, maybe a half a quarter, past the point where the body was buried?

A. (witness nods affirmatively.)

Q. All right. Now, Tom, that was after midnight on Friday night, wasn't it?

A. Yes, sir."

In his statement to the officers the appellant stated that he had left the shotgun and the .22 rifle in the corner of the bedroom; that he left the chamber open on the pump shotgun and that there wasn't supposed to be a bullet in the .22 rifle. He stated that he never did leave a live round of ammunition in the barrel of the rifle, but there must have been one left in the barrel on the night his wife was killed. He stated that he and his brother's little boy had recently been squirrel hunting, "and I always left it with a hull in the chamber where he would have to reload to where it would fire, you know." He stated that regardless of the fact that he never left a live shell in the barrel of his .22 rifle, "I know there was bound to be a live shell in the barrel when it was stood up there." He stated that he always kept his guns in the corner of the bedroom but when his wife was there she would put them in the closet. He says that when he heard the shot and went into the bedroom, his wife was lying on her back across the bed with her feet hanging off of it, and that the guns were lying in the middle of the floor.

He stated that he saw the wound just below her breast. He stated that his wife had a brassiere and panties on, and that the .22 rifle was lying on the floor with the barrel pointed towards the bed; that the shotgun was also in the floor with the barrel pointed kind of towards the closet. He stated that there was a coat hanger or two lying with the guns and that the slide closet door was off the track. He explained in his statement as to why he did not call his brother who lived nearby:

"A.   I got scared. I didn't know what to do. And I got to thinking that we had had so many arguments in the past that everybody would think that I shot that gun.

Q.   Did you have your hand on the gun before it was fired?

A.   No, I had put my shotgun over there, but I never touched the twenty-two.

Q.   You hadn't touched the twenty-two that night before she was killed?

A.   No. There was a hull in the twenty-two, but there wasn't no other bullets.

Q.   Since that time have you re-loaded that gun?

A.   Yes, I have re-loaded it.

Q.   Why did you do that?

A.   My little dog got out, and somebody kicked it out there, or it run into a bush. It hollered out the side of the trailer. I heard it holler, and it come back in. He was—

Q.   Let me ask you this. There was an empty shell found out there in your trailer. Is that the shell that killed her? Is that the casing from the shell that killed her?

A. No.

Q. What did you do with the shell that was in the gun?

A. I throwed it out in front of the yard.

Q. Throwed it out in front of the yard? You mean you threw it out the front door?

A. Yes.

Q. Straight out the front door, or the right, or to the left?

A. It hit my car fender out there. I heard it hit.

\* \* \*

Q. When did you take that shell out?

A. Right that night.

Q. Right after it happened?

A. And throwed it out. And I checked and there wasn't any shells in the gun for the next two or three days, and I reloaded it.

Q. Why did you re-load it? Because of the dog incident?

A. I heard the dog holler and I thought there was somebody out there. The hull, if there was one in the trailer, I shot that gun at a field lark out there several times, a long time ago.

Q. Now, Tom, why was the body found without anything on it other than brassiere around the neck?

A. Her britches was on her unless they hung on

something about the turtle hull. The britches are still out here—her pants is.

Q. You are saying, Tom, that her panties are definitely there in the grave?

A. Or between there at that place somewhere, because I hung them when I started—They hung when I started out with her.

Q. Why was her brassiere up around her neck?

A. I guess it's when I moved her. It probably slipped up.

Q. You have told us before this afternoon that when you went out there and moved the body from where it was covered with leaves down to the shallow grave that you dug Monday night, that you may have pulled her by her brassiere.

A. I might have.

Q. You didn't take the brassiere off of her body and put it around her neck?

A. No.

\* \* \*

Q. I believe you told us earlier that you did not take a piece of that sheet to this barrel just north of your trailer and burn it.

A. I don't know whether I did or not. I was so scared.

Q. Did you tear the sheet?

A. I don't remember that sheet.

Q. You don't think you could remember if you took a piece of this bloody sheet and—

A. I don't believe I carried any out, but I possibly could.

Q. You say you don't believe you carried any back to the trailer?

A. I know I didn't carry any back. I might have took it out before I left, but I don't even remember it. I can't—I was so scared I didn't know what to do.

Q. Are you sure this body was stiff when you first—by the time you got there?

A. Yes. I checked it three or four times, and I checked it up there.

Q. I believe you told us earlier it was between 30 and 40 minutes after she died that you took her out there.

A. It took me a long time to lift her.

Q. And get her in your car?

A. Around 40 minutes. Or 30 minutes.

Q. Did you fire up your car then and turn the lights on and drive out toward Center Point when you took the body out there?

A. Yes.

Q. Tom have you changed the mattress on the bed since that happened?

A. No.

Q. Didn't it have blood on it?

A. No.

Q. You must have taken the body off the bed right away.

A. I checked it 30 minutes, 30 or 40 minutes.

Q. You mean the body remained on the bed 30 or 40 minutes?

A. It sure did.

Q. You're saying then that it stayed on the bed till you got ready to take it out, put it in your car and go on out to the woods?

A. That's right. I didn't know where I was going when I started out."

We are of the opinion that the evidence in this case is amply sufficient to sustain the conviction of murder in the second degree. It is well settled that in testing the sufficiency of the evidence on appeal to sustain a jury verdict in a criminal case, the evidence must be viewed in the light most favorable to the state, and that circumstantial evidence has long been recognized by law as sufficient to sustain a conviction. *Cook* v. *State*, 248 Ark. 332, 451 S. W. 2d 473. We are also of the opinion that there was ample circumstantial evidence in this case from which the jury could have reasonably found that the appellant fired the gun that killed his wife.

The jury had a right to consider the circumstantial evidence of the appellant's mistreatment and threats to kill his wife over the years, as well as his panic following her death, and his attempt to secrete her body first by covering it with leaves and then burying it in a shallow grave.

There is no question but that the gun was fired at close range as evidenced by powder burns around the hole in the brassiere the deceased was wearing, as well as powder stains on the skin around the wound. The appellant testified positively that it was only a very short period from the time they entered the trailer until he heard the gunshot. The deceased put groceries up while the appellant put his shotgun in the corner, yet his wife

was completely undressed with the exception of her brassiere and panties according to his testimony. The appellant testified positively that when he went into the bedroom following the shot, his wife was lying on her back across the bed and with the .22 rifle also lying with the shotgun on the floor of the trailer with the rifle barrel pointed in the direction of the bed. The most damaging bit of circumstantial evidence is the course of the bullet through the deceased's thoracic cavity. The state medical examiner, Dr. Rodney F. Carlton, testified as follows:

"Q. Did you in your autopsy determine the course that the bullet had taken through the body?

A. Yes, I did.

Q. What did you determine that to be?

A. The bullet went front to back, left to right, with a slightly downward deviation. The resting site of the bullet was approximately one to one and a half inches below the entrance site in the skin.

Q. Now, Dr. Carlton, when you say—Did you say a slightly downward?

A. Yes, sir.

Q. Can you tell the jury what you mean by slightly downward through the body?

A. Approximately one and one-half inches from the entrance wound to the resting site, down, toward the feet.

Q. Did you examine the internal organs between the place of the entrance wound and the place where the bullet rested?

A. Yes, I did.

Q. And did that confirm the course of the bullet through the body?

A. Yes, sir.

Q. Can you describe the track between the entrance wound and where the bullet lay, or rested?

A. Yes, sir. It entered the first cavity through the fourth intercostal space, that is, the space between the fourth and fifth ribs. It perforated the right and left side of the heart, went through the sac enclosing the heart and into the backbone, which was practically in the mid-line of the body.

Q. Then there wasn't any substantial deviation in the course of the bullet after the bullet entered the body and where it wound up?

A. No, sir."

The jury might well have concluded from this evidence that had the deceased accidentally shot herself, the bullet would have ranged upward through her body rather than downward, and that she would have fallen forward on the floor rather than backwards onto the bed. The jury might well have considered that the most logical explanation for the position of the body and the course of the bullet was that the appellant simply shot his wife while she was sitting on the side of the bed. Another bit of circumstantial evidence the jury might well have considered as pointing to the guilt of the appellant, was his admitted effort to burn the bedsheet bearing the blood stains from his wife's fatal wound. He remembered attempting to burn the sheet in the gravel pit near where the body was found and in which a part of the burned sheet was found. He remembered nothing of attempting to burn the sheet in the barrel incinerator near the trailer, but admits that he may have attempted to do so.

Another very potent item of circumstantial evidence unfavorable to the appellant lay in his attempted explanation of the ejected .22 rifle ammunition casing found on the bedroom floor of the trailer. He testified that the rifle was a pump type repeating rifle and that when the rifle was last used, an empty casing was left in the barrel. He also testified that after the round was fired that killed his wife, he ejected the empty casing from the chamber of the rifle and disposed of the casing by throwing it into the yard. He does not attempt to explain how the empty casing got onto the floor of the trailer, except to state that he had shot at a field lark sometime previously. Of course, if there was an empty casing in the firing chamber of the rifle when he left it standing in the corner of the bedroom, it would have been necessary to eject this casing before a live round of ammunition was placed in the chamber for firing. The appellant testified that there must have been a live round of ammunition in the firing chamber rather than a spent casing, but the jury might well have concluded that if the empty casing found on the floor of the trailer did not originally contain the bullet that killed Mrs. Thomas; then it must have been the casing which was ejected, at the same time the live ammunition that did kill Mrs. Thomas, was injected into the firing chamber of the rifle. There was also uncontradicted evidence from the police officers who examined the rifle, that they could not cause it to fire accidentally by jarring it, and no fingerprints could be found on the rifle.

In the appellant's statement admitted in evidence, he stated that he remained in the trailer from 30 to 45 minutes before attempting to remove the body of his wife and he makes no explanation of what he was doing during this time. In the testimony he gave before the jury, he testified that when he was carrying his wife's body out of the trailer, and as he was going down the steps of the trailer, he panicked and decided to secrete the body. The jury might well have considered such delay as deliberate on the part of the appellant to make sure his wife was dead before he attempted to do anything for her, or to do anything with her dead body.

We conclude, therefore, that the evidence was substantial and that the jury was lenient in assessing the penalty at only ten years on the appellant's conviction of murder in the second degree.

The judgment is affirmed.